**JOLLY GOOD INDUSTRIES, INC. and Continental Gum of Canada Limited, Division of 493207 Ontario, Ltd. Plaintiffs,**

v.

**ELEGRA INC., d/b/a Horizon Creations and Accord Inc., d/b/a Cal Sternberg & Associates, Defendants.**

No. 88 Civ. 3823 (JMC).

United States District Court, S.D. New York.

July 6, 1988.

Steven B. Pokotilow, Laura E. Goldbard, Blum Kaplan, New York City, for plaintiffs.

Gerard F. Dunne, Jill B. Oshin, Wyatt, Gerber, Shoup & Badie, New York City, for defendants.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

Plaintiffs' motion for a preliminary injunction is granted. Fed.R.Civ.P. 65(a).

### BACKGROUND

This is an action for trade dress infringement and unfair competition. Plaintiffs Jolly Good Industries, Inc. and Continental Gum of Canada, Ltd. ["Jolly Good"] import and distribute a 21–inch high beverage dispenser, designed to be a replica of a 1920's era gasoline pump. Defendants Elegra Inc. d/b/a Horizon Creations and Accord Inc. d/b/a Cal Sternberg & Associates, are planning to import and distribute a gumball machine and aquarium which utilize the same design as Jolly Good's beverage dispenser. No gumball machines or aquariums have yet been produced. However, the molds have been prepared and defendants' Taiwanese manufacturer is ready to commence production.

Jolly Good's beverage dispenser is designed to hold and dispense up to 48 ounces of liquid. The unit rests on a black, octagonal two-level base, aproximately ¾ of an inch high. The next component is a metal cylinder, approximately eight inches high and thirteen inches in circumference. The cylinder is interspersed with vertical indentations, spaced approximately one inch apart, and has three decals in front and one in back. On the upper left side of the cylinder, a small hook supports a palm-sized version of a modern-day gasoline pump handle, which is connected to a rubber hose leading to the bottom of the cylinder. On the right side of the cylinder is a movable, five-inch black plastic pump. It is a replica of the 1920's pump used by patrons to deliver the desired amount of gasoline to the dispensing mechanism.

Resting upon the metal cylinder is a round glass container, surrounded by vertical metal bars approximately two inches apart. The container has twelve gradation lines, each accompanied by its corresponding number. The vertical bars are screwed into a round metal top. A plastic display attachment fits into the metal top. It is circular, with a flat front surface, and is used to display any one of six available logos, each apparently representing a prominent gasoline company of the 1920s. The display attachment lights up and is powered by two "AA" batteries.

Defendants have yet to manufacture their products. Instead, they have contracted with a Taiwanese manufacturer to produce a gumball machine and aquarium utilizing the same design motif as Jolly Good's beverage dispenser. In fact, in order to advertise their future product at a

May 1988 trade show for the gift industry, defendants actually purchased several of plaintiffs' beverage dispensers and "cannibalized" them in order to print brochures and set up a display. For their gumball machine, defendants cut a hole through the metal cylinder portion of the beverage dispenser and installed a gumball dispensing mechanism. For their aquarium, defendants utilized a larger-sized glass container because the size of aquarium tanks are regulated by state laws governing their sale. Essentially all the other features remained the same. At the trade show, defendants received orders for approximately 6,000 pieces. The president of Elegra testified that he informed all of his customers that the models on display were merely prototypes and that the actual product shipped might look somewhat different. He further testified that the product defendants intend to manufacture will be different than plaintiffs' in that (1) the handle and nozzle will be nonfunctional, (2) the display attachment will not light up or hold any of the six logos utilized by Jolly Good, and (3) the gumball dispensing receptacle will be placed at the very bottom of the metal cylinder, rather than towards the top of the cylinder.

Plaintiffs allege that the gumball machine and aquarium are merely pirated versions of their unique and distinctive product. They seek injunctive and other relief pursuant to section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the common law of New York.[1]

## DISCUSSION

The standards for granting a preliminary injunction in this circuit are well established. Plaintiffs must make a showing of

> both possible irreparable injury [in the absence of interim relief] and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.

*LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 74 (2d Cir.1985), *quoted in Stormy*

*Clime, Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 973 (2d Cir.1987).

### A. The Lanham Act Claim

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), establishes a federal law of unfair competition prohibiting the marketing of a product which conveys a false designation of origin. *Stormy Clime*, 809 F.2d at 974; *LeSportsac*, 754 F.2d at 75. Under this section, the first manufacturer of a product is entitled to an unregistered trademark in the "trade dress" of the product. *Stormy Clime*, 809 F.2d at 974. The trade dress of a product " 'involves the total image of a product and may include features such as size, shape, color or color combinations, texture, [or] graphics.' " *Id.* (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir.1983)). Traditionally, trade dress infringement actions have involved the packaging or labelling of goods. *Stormy Clime*, 809 F.2d at 974; *LeSportsac*, 754 F.2d at 75. It is now settled in this circuit, however, that the design of a product may function as its packaging, "thereby entitling the manufacturer to trade dress protection for the appearance of the product." *Stormy Clime*, 809 F.2d at 974; *see LeSportsac*, 754 F.2d at 75; *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 78 (2d Cir.1981).

To establish a claim for trade dress infringement in the design of a product, the party seeking protection must demonstrate that the design of its product has acquired secondary meaning in the marketplace, by which it is identified with its producer or source, *see LeSportsac*, 754 F.2d at 75, and that the design of the competitor's product is likely to confuse consumers as to the product's source, *id.* Even if the first manufacturer prevails on these showings, the competitor can prevail "by showing that the similar arrangement of features is functional." *Stormy Clime*, 809 F.2d at 974. In this regard, the burden of proof is on the competitor. *See LeSportsac*, 754 F.2d at 75–76.

---

1. Defendants do not challenge either the Court's subject matter or personal jurisdiction.

### 1. *Secondary Meaning*

■ The trade dress of a product has achieved secondary meaning when the "purchasing public associates that dress with a single producer or source rather than just with the product itself." *Id.* at 78. In order to establish sufficiently serious questions of secondary meaning, it is enough that plaintiffs offer proof of such things as (1) substantial advertising expenditures, (2) great sales success, (3) unsolicited media coverage, and (4) derendants, deliberate attempt to imitate its product. *See id.*

■ Along these lines, plaintiffs offered the following evidence. Since introducing its product in February 1987, Jolly Good has spent approximately $100,000 for advertising. Much of this expenditure took the form of discounts awarded to catalog companies and the like which agreed to advertise the dispenser in their catalogs. Plaintiffs presented evidence that the dispenser has been a highly successful product, generating approximately $625,000 in sales in 1987, or nearly 33 percent of the company's revenues. There was also evidence that the Jolly Good dispenser has received unsolicited media coverage. *See* Plaintiffs' Exhs. 24, 26. Lastly, much evidence was presented to support the conclusion that defendants deliberately attempted to imitate the Jolly Good design in fashioning their own products.

With respect to the issue of intentional copying, the evidence was overwhelming. Entered into evidence were the defendants' gumball machine and aquarium, Plaintiffs' Exhs. 28, 29, along with a brochure prepared by them for the May 1988 trade show. *Id.,* Exh. 27. To the eye, the defendants' products look exactly like the Jolly Good dispenser. This is because they actually were made from Jolly Good dispensers. Defendants conceded that, in order to display a product at the May 1988 show, they had to "cannibalize" the Jolly

Good dispenser. Gary Schein, president and founder of defendant Elegra Inc., testified that the idea for the gumball machine and aquarium came, at least in part, from the Jolly Good dispenser. Schein sent the dispenser to a Taiwanese manufacturer to determine how much it would cost to produce an *identical* product. Schein did not know whether the Taiwanese manufacturer had actually used the Jolly Good dispenser to create the molds for defendants' products. Schein also testified that his finished products will look substantially similar to the Jolly Good dispenser, with the minor modifications discussed earlier.[2] Lastly, Schein acknowledged that on occasions when he described his products or showed his brochure to customers, some told him that Jolly Good makes a similar product.

With respect to secondary meaning, plaintiffs principally rely on the case of *Metro Kane Imports, Ltd. v. Federated Department Stores Inc.,* 625 F.Supp. 313 (S.D.N.Y.1985), *aff'd sub nom.,* 800 F.2d 1128 (2d Cir.1986). In that case, which involved an infringing orange juice squeezer, the court framed the issue as follows: "where secondary meaning is 'in the making' but not yet fully developed, a trademark or trade dress will be protected against *intentional, deliberate attempts to capitalize on a distinctive product.*" *Id.* at 316 (emphasis added). The court went further and analogized the secondary meaning in the making, or incipient secondary meaning, theory to the "second comer" doctrine, which states that:

[a] senior user in possession of a distinctive mark has a right not to have a second comer intentionally cause a likelihood of confusion between the two marks in an attempt to exploit the reputation of the senior user's mark, since this would deprive the first user of control over its reputation and goodwill.

*Id.* at 317 (quoting *Thompson Medical Co. v. Pfizer, Inc.,* 753 F.2d 208, 214 (2d Cir.

---

**2.** As discussed above, the modifications are (1) the handle and nozzle will be nonfunctional; (2) the display attachment will not light up and will not use any of the six logos used by Jolly Good; and (3) the gumball dispenser will be located at the bottom of the metal cylinder. Of course, the fact that the handle will be nonfunctional will not, presumably, affect its appearance in any way. In the same sense, the other modifications will not alter the overall look of the gumball machine and aquarium, which will continue to resemble the Jolly Good dispenser.

1985)); *see also Slazengers Ltd. v. Stoller,* No. 88 C 3722, slip op. at n. 10 (N.D.Ill. May 31, 1988) [available on WESTLAW, 1988 WL 58579] (available on LEXIS, Genfed library, Dist. file) ("[I]nfringer seeks to piggyback upon the goods, reputation or market share previously staked out by some other producer of the item."); *Tomy Corp. v. P.G. Continental, Inc.,* 534 F.Supp. 595, 598–99 (S.D.N.Y.1982) ("[P]laintiffs must establish ... *either* that defendants *intentionally copied* their product, hoping to profit from the market plaintiffs had created; or that the particular color scheme plaintiffs employ ... has achieved *secondary meaning.*") (emphasis added and in original). In conclusion, the court found that "a viable federal question" was raised by a defendant's allegation that intentional copying of a "product's highly distinctive trade dress" interfered with plaintiff's "attempt to develop secondary meaning." *Id.*

The Court finds the *Metro Kane* analysis persuasive, at least at this preliminary stage. No court in this circuit has explicitly rejected the theory of secondary meaning in the making, while the court of appeals has twice reviewed the theory without condemnation or criticism, especially where there exists strong evidence of intentional copying. *See, e.g., Metro Kane,* 625 F.Supp. 313, 316–17 (S.D.N.Y.1985), *aff'd sub nom.,* 800 F.2d 1128 (2d Cir.1986); *National Lampoon, Inc. v. American Broadcasting Cos., Inc.,* 376 F.Supp. 733, 747 (S.D.N.Y.), *aff'd,* 497 F.2d 1343, 1343 (2d Cir.1974) ("[T]he judge justifiably found that the defendant ... had deliberately attempted to exploit [plaintiff's] well-known name and reputation."). *See also Scholastic, Inc. v. MacMillan, Inc.,* 650 F.Supp. 866, 872 n. 3 (S.D.N.Y.1987) (Lumbard, J., sitting by designation); *Loctite Corp. v. National Starch & Chemical,* 516 F.Supp. 190, 210 (S.D.N.Y.1981); *Orion Pictures Co. v. Dell Publishing Co.,* 471 F.Supp. 392, 396 (S.D.N.Y.1979); *Blake Publishing Corp. v. O'Quinn Studios, Inc.,* 202 U.S.P. Q. 848 (S.D.N.Y.1979); *West & Co. v. Arica Institute,* 194 U.S.P.Q. 32 (S.D.N.Y.1976); *Glamorene Products Corp. v. Boyle–Midway, Inc.,* 188 U.S.P.Q. 145 (S.D.N.Y.1975).

The theory of incipient secondary meaning has also been well-received by commentators:

> A mark with secondary meaning in the making should also be protected, *at least against those who appropriate it with knowledge or good reason to know of its potential in that regard, or with an intent to capitalize on its quality.* "Piracy should no more be tolerated in the earlier stages of development of quality than in the latter."

3 R. Callman, *Unfair Competition Trademarks and Monopolies* § 77.3, at 356 (3d ed. 1971) (quotation omitted) (emphasis added). In this case, defendants clearly had knowledge of Jolly Good's success with its dispenser and the overwhelming evidence of intentional copying is "persuasive, if not conclusive, evidence of [the] consumer recognition and good will" which they sought to exploit to their advantage. *See 20th Century Wear, Inc. v. Sanmark–Stardust Inc.,* 815 F.2d 8, 10 (2d Cir.1987) (citing *LeSportsac,* 754 F.2d at 78; *RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1060 (2d Cir.1979)). In light of the above, the Court concludes that plaintiffs have shown sufficiently serious questions going to the merits to warrant preliminary injunctive relief.

### 2. *Likelihood of Confusion*

■ As just discussed, it is not seriously in dispute that defendants intentionally copied plaintiffs' overall design. They went so far as to "cannibalize" Jolly Good's dispensers in order to make photographs for a brochure and set up a display booth at an annual trade show, at which plaintiffs' dispenser was being displayed. There was even evidence of actual confusion among buyers at the trade show. In any event, it is by now axiomatic that intentional copying gives rise to a presumption of a likelihood of confusion. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 258 (2d Cir.1987); *Perfect Fit Industries v. Acme Quilting Co.,* 618 F.2d 950, 954 (2d Cir.1980) (citing cases), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.

2d 71 (1982). Thus, plaintiffs have likewise satisfied their burden as to this element.

### B. *Public Domain and Functionality Defense*

■ Defendants argue that Jolly Good's design is in the public domain because it represents a piece of "Americana" and, therefore, is not entitled to trade dress protection. Purely on a factual basis, the argument is without significant merit. There is no single embodiment of the 1920's era gasoline pump. In fact, there were many variations of the pump, some of which are quite dissimilar in appearance to the Jolly Good replica. *See, e.g.,* Defendants' Exhs. A, B.

Defendants next argue that an aesthetic functionality defense is available to them. They pose the question, drawn from *LeSportsac,* as follows:

Are consumers likely to purchase [Jolly Good's 1920's replica gas pump] rather than that of a competitor principally because they find [Jolly Good's] particular combination of design features aesthetically pleasing, or will they buy principally because the product features serve to identify or distinguish the goods as genuine [Jolly Good] products?

*Id.*

In the Court's view, defendants misapply the court's reasoning in *LeSportsac.* In that case, Chief Judge Feinberg noted that plaintiff claimed "as its mark the particular combination and arrangement of design elements that identify its [products] and distinguish them from other [similar products]." 754 F.2d at 76. Likewise in this case, plaintiffs do not object to defendants manufacturing a gumball machine designed generally as a replica of a 1920's gasoline pump, but rather, seek protection from defendants' intentional copying of their dispenser's "particular combination and arrangement of design elements." *Id.* These include the handle/nozzle and hose, the black plastic pump, the vertical metal bars surrounding the glass container, the gradation lines with corresponding numbers, the display attachment, and the logos. In addition, defendants, products are the same height as the Jolly Good dispenser, and, with the exception of the aquarium's glass container, their features share the same physical dimensions as the dispenser. It seems beyond peradventure that defendants' intent was to usurp the appeal of Jolly Good's dispenser and, by offering their gumball machine and aquarium to wholesalers at a lower price, to capture the market that was being developed by plaintiffs.

■ This conclusion is further supported by the fact, as agreed to by both parties, that people are inclined to buy the dispenser, gumball machine and aquarium not because of their practical uses, but for use as an ornamental or conversation piece in the home. In this sense, none of the design features mentioned above and copied by defendants are truly functional, *i.e.,* "essential to the use or purpose of the article." *Inwood Laboratories v. Ives Laboratories, Inc.,* 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982), *quoted in LeSportsac,* 754 F.2d at 76. Instead, these features could more "properly be classified as 'mere arbitrary embellishment[s] ... adopted for purposes of identification and individuality.'" *Vibrant Sales, Inc. v. New Body Boutique, Inc.,* 652 F.2d 299, 304 (2d Cir.1981) (quoting *Pagliero v. Wallace China Co.,* 198 F.2d 339, 343 (9th Cir.1952)). Thus, "[w]hile the ultimate disposition of this question awaits a trial on the merits," the Court today finds that "the [particular] combination and arrangement of design features" on the Jolly Good dispenser serve and are intended to serve "the trademark purpose of identification." *Id.* For the foregoing reasons, the Court concludes that defendants have failed to meet their burden of proof on this issue.

### C. *Irreparable Harm/Balance of Hardships*

■ As a general rule, a finding of irreparable harm almost inevitably follows a finding of likelihood of confusion. *See Church of Scientology Int'l v. The Elmira Mission,* 794 F.2d 38, 41 (2d Cir.1986); *LeSportsac,* 754 F.2d at 79. The Court can only conclude that plaintiffs have met their

burden on this issue. When plaintiffs first introduced the liquid dispenser at the May 1987 trade show, 400 orders were placed. At the May 1988 trade show, only 100 orders were placed, despite evidence that the dispenser had been highly successful throughout the previous year and had generated substantial interest among consumers. At the May 1988 trade show, defendants received orders for approximately 6,000 gumball machines and aquariums, on the basis of samples actually made from Jolly Good dispensers. Moreover, the dispenser represents approximately 30 percent of plaintiffs' sales revenue, with the remaining 70 percent split among 15 other products. Lastly, plaintiffs have spent approximately $200,000 on product development and advertising. Defendants have paid their Taiwanese manufacturer approximately $25,000 to create the molds necessary for production of the gumball machine and aquarium. Under such circumstances, allowing defendants to proceed with production and distribution in the United States would not only create a real possibility of irreparable harm to plaintiffs in terms of lost market share and consumer goodwill, but would reward defendants for an act of intentional copying of plaintiffs' design, which they undertook with minimal cost and effort.

### D. *Unfair Competition Under New York Law*

Plaintiffs also have a claim for unfair competition under the common law of New York. "The essence of an unfair competition claim under New York law is that the defendant misappropriated the labors and expenditures of another. Central to this notion is some element of bad faith." *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980). Proof of secondary meaning is not necessary under New York law, *see 20th Century Wear*, 815 F.2d at 11, particularly where deliberate copying has been shown, *see Morex S.P.A. v. Design Institute America, Inc.*, 779 F.2d 799, 801 (2d Cir.1985) (per curiam). Likelihood of confusion must be shown, and as discussed above, is presumed where intentional copying has been established. Furthermore, the trade dress must be "distinctive" in order to be protected. *Id.; Perfect Fit*, 618 F.2d at 954; *Polo Fashions, Inc. v. Extra Special Products, Inc.*, 451 F.Supp. 555, 559 (S.D.N.Y.1978). For the reasons stated above, the Court concludes that plaintiffs have at the very least shown sufficiently serious questions going to the merits of these issues to warrant preliminary relief. Moreover, in New York, "[t]he controlling question in all cases where the equity power of the courts is invoked is whether the acts are fair or unfair, according to principles recognized in equity." *National Lampoon*, 376 F.Supp. at 747 (quotations omitted).

### E. *Scope of Preliminary Relief*

For all of the foregoing reasons, plaintiffs have established the requisite elements entitling them to preliminary injunctive relief. Accordingly, defendants, their officers, agents, servants, employees, successors, assigns, and all persons in active concert or participation with them, who receive actual notice of these proceedings, are preliminarily restrained and enjoined from:

(a) selling, offering for sale, promoting, advertising, proceeding with the manufacture of, or in any way distributing any gumball machine or aquarium, which appears similar to plaintiffs' beverage dispenser; and

(b) destroying or otherwise transferring possession or control of any records, documents or any other information relating to the procurement, source of supply, production or sale of gumball machines or aquariums as depicted in Exhibit 3 to the Complaint.

The Court declines at this time to require that any particular notice or letter be sent to any of defendants' customers who have previously placed orders for the gumball machine and/or aquarium.

As a condition to entry of the injunction, plaintiffs shall post, within five (5) days of this decision, a bond in the amount of $30,000.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction is granted. Fed.R.Civ.P. 65(a). The injunction is issued on the condition that a bond be posted in the amount set forth herein.

SO ORDERED.