L. & J.G. STICKLEY, INC., Plaintiff,

v.

CANAL DOVER FURNITURE CO., INC. and Charles F. Kuder, individually, Defendants.

No. 95–CV–492 (FJS).

United States District Court, N.D. New York.

July 7, 1995.

**416**

Heslin & Rothenberg, P.C., Albany, N.Y. (Susan E. Farley, Nicholas Mesiti, of counsel), for plaintiff.

MacKenzie, Smith, Lewis, Michell & Hughes, Syracuse, NY (Peter Carmen, of counsel), Renner, Kenner, Greive, Bobak, Taylor & Weber, Akron, OH (Ray L. Weber, Sylvia A. Petrosky, of counsel), for defendants.

## DECISION AND ORDER

SCULLIN, District Judge.

### Introduction

■ This is an action for trade dress infringement, false advertising, and "palming off" pursuant to section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Plaintiff also pleads common law actions alleging unfair competition and dilution.[1]

L. & J.G. Stickley, Inc. ("Stickley"), a furniture manufacturer, claims that several pieces of the Stillwater and Stonehouse lines of furniture manufactured by defendant Canal Dover Furniture, Co., Inc. ("Canal Dover"), infringe the trade dress of six pieces in Stickley's Mission Collection.[2] On April 24, 1995, the Court granted plaintiff's motion for a temporary restraining order.[3] Presently

---

1. Because the Court finds that plaintiff merits a preliminary injunction with respect to its claim under section 43(a) of the Lanham Act, it is unnecessary to consider the merits of its unfair competition and dilution claims. However, in this connection the Court notes that proof sufficient to support a trademark infringement claim logically and legally establishes an unfair competition claim. *Habitat Design Holdings, Ltd. v. Habitat, Inc.*, 436 F.Supp. 327, 334 (S.D.N.Y. 1977), *modified on other grounds*, 573 F.2d 1290, 200 U.S.P.Q. 10 (2d Cir.1978); *see Jolly Good Indus., Inc. v. Elegra Inc.*, 690 F.Supp. 227, 233 (S.D.N.Y.1988).

2. The six pieces are the (1) Spindle Arm Chair, (2) Spindle Side Chair, (3) the Spindle Settee, (4) Harvey Ellis Side Chair, (5) Harvey Ellis Arm Chair, and (6) Sideboard Oak. With the exception of the Sideboard, each of these pieces is available in either oak or cherry.

3. The Order signed by the Court enjoined defendants from (1) displaying or advertising a side or arm chair confusingly similar to Stickley's Harvey Ellis Arm and Side Chairs, (2) shipping furniture whose appearance resembles the trade dress of Stickley's Mission Collection furniture, and (3) shipping six specific pieces of its Stillwater Collection that correspond to Stickley's Spindle Arm

before the Court is plaintiff's motion for a preliminary injunction. On May 8, 1995, the Court held a hearing on the preliminary injunction motion pursuant to Fed.R.Civ.P. 65(b), at which the Court reserved decision.[4]

### Factual Background

Plaintiff L. & J.G. Stickley, Inc. is the successor by merger to eight furniture manufacturing entities, the earliest of which was formed in 1884.[5] Complaint, Ex. B at 4. The two most important of these entities for present purposes are the Craftsman Shops of Gustav Stickley and L. & J.G. Stickley, formed by Leopold and J.G. Stickley in 1900.

With the exception of the Sideboard, the particular pieces at issue in the case at bar were designed in the early 1900s by Gustav Stickley ("G. Stickley") and Harvey Ellis, a designer who worked for G. Stickley. The pieces are examples of "Mission furniture" manufactured in the "Craftsman style," an outgrowth of the Arts and Crafts Movement of that time. Defs' Opp.Memo., Ex. C at 5, Ex. D. at 2. The original pieces were manufactured in G. Stickley's Craftsman Shops, which operated in Eastwood, New York, between 1898 and 1916.

Consistent with the philosophy of the Arts and Crafts Movement, G. Stickley published construction plans for his furniture in a monthly magazine called *The Craftsman* (1901–1916), and therein encouraged others to build the furniture for themselves. Defs' Hearing Ex. B at 3. Due to the popularity of Mission furniture, G. Stickley contended with many copyists and competitors, one of whom was L. & J.G. Stickley. Defs' Opp.Memo. at 4–5. In 1916 the Craftsman Shops, L. & J.G. Stickley, and two other Stickley entities were absorbed into a single entity, Stickley Associated Cabinet Makers, the direct ancestor of today's L. & J.G. Stickley, Inc.

During the 1920s Mission furniture fell out of style and Stickley and its various copyists and competitors stopped manufacturing and selling it. By the mid–1920s sales of Mission furniture ceased completely. Aminy Audi Aff. ¶ 4 (hereinafter "Am.Audi Aff."). In the 1980s the popularity of original Mission furniture experienced a rapid and powerful resurgence, as evidenced by Barbara Streisand's 1988 purchase of an original G. Stickley sideboard for $363,000.

In response to Mission furniture's rapidly expanding popularity L. & J.G. Stickley, Inc., in 1989, began manufacturing its Mission line which included many classic as well as newly designed pieces (hereinafter "Mission Collection"). Am.Audi Aff ¶ 6; Alfred Audi Aff. ¶ 3 (hereinafter "Al.Audi Aff."). At the time of its introduction in 1989, no other furniture being manufactured had a look or appearance similar to the pieces in Stickley's Mission Collection. Am.Audi Aff. ¶ 3; Al.Audi Aff. ¶ 8. The first Mission-type furniture to enter the market following Stickley's reintroduction was the Legend line by Bassett Furniture Industries, Inc., in 1991. Kuder Aff. ¶ 2.

The classic pieces reintroduced by Stickley in its Mission Collection were painstaking line-by-line reproductions of G. Stickley originals. Because such attention to detail requires labor intensive production techniques, the furniture is costly to produce. As a result, Stickley presently occupies the "high end" of the market in the Mission furniture renaissance. Kuder Aff. ¶ 3; Am.Audi Aff., Ex. B. All six pieces at issue in the case at bar are from the Mission Collection.

Chair, Side Chair, and Settee pending the hearing on plaintiff's motion for a preliminary injunction.

Notwithstanding the Court's Order, defendants displayed their version of Stickley's Harvey Ellis chair at the High Point Market, a national trade show, on April 27, 1995. Defendants claim that the chairs displayed represented a significant redesign of the chairs originally objected to by plaintiff, and thus, their display was appropriate under the Court's order. However, at the show plaintiff objected to the display of the chairs and informed defendants that it considered such display to be in contempt of the Court's Temporary Restraining Order. Defendants did not inform the Court that it planned to display the redesigned chairs prior to doing so.

4. Good cause having been shown during the hearing, the Court continued the April 24 Temporary Restraining Order in force until the entry of this Decision and Order, at which time the Temporary Restraining Order is dissolved.

5. There were five Stickley brothers, each of whom manufactured furniture.

According to the defendants they first became aware that Mission style furniture was increasing in popularity sometime in 1991. At that time Charles F. Kuder, President of defendant Canal Dover, learned that "although numerous companies were selling mission style ... furniture, the two having the most success were L & J.G. Stickley, Inc. with its Mission Oak line ... and Bassett Furniture Industries, Inc....." Kuder Aff. ¶ 2. It was then that Canal Dover began to design its Stillwater line, several pieces of which are at issue in the case at bar.

Defendants contend that in the process of seeking designs and suppliers in 1992, they happened upon "a number of history books relating to furniture designs, and from one of those books ... chose the spindle chair of Gustav Stickley as ... one which would go well with [their] other dining room furniture." Kuder Aff. ¶ 7. Thus, defendants maintain that they designed the Stillwater Spindle Chair based upon the G. Stickley design found in these books. Canal Dover did not seek to make an exact line-by-line reproduction of the G. Stickley chair, but a chair whose production costs would allow defendants to occupy the "upper-middle price line" of Mission-style furniture. Kuder Aff. ¶¶ 3, 7–8. Canal Dover first introduced the Stillwater Spindle Chair at the April 1993 High Point Market trade show. Because of the success of the Stillwater chair, Canal Dover has expanded the Stillwater line to include the other pieces at issue.

In 1994 Canal Dover decided to further expand its line of Mission-style furniture to include a representation of a Harvey Ellis chair design from the "history book," which they named the Stonehouse chairs.[6] See Kuder Aff. ¶¶ 14–17. At the time the designs were selected, defendants claim they were unaware that Stickley produced Harvey Ellis chairs as a part of its Mission Collection.

---

6. The Stonehouse chairs are the Stonehouse Side Chair and the Stonehouse Arm Chair.

7. Canal Dover had employed Francher to manufacture some of its other lines of furniture including the Stillwater line. Kuder Aff. ¶ 12. When defendants approached Francher to manufacture their design of the Stonehouse chair, Bruce Erickson of Francher advised Kuder that Francher produced Stickley's Harvey Ellis chair, and did

Kuder Aff. ¶ 16. Francher Chair Co. ("Francher"), the manufacturer defendants selected to make the Stonehouse chairs, also manufactured Stickley's Harvey Ellis chairs.[7] The Stonehouse chairs were introduced at the 1995 High Point Market trade show.

Plaintiff purportedly discovered that defendants were manufacturing the Stillwater line after Stillwater pieces appeared on the cover of the March 17, 1995 issue of *Furniture Today*. Plaintiff first became aware of the Stonehouse line during a visit to Francher on April 3, 1995, during which Paul Terwilliger, Vice President for Manufacturing of Stickley, came across unfinished pieces of Canal Dover's Stonehouse chairs. Terwilliger Aff. ¶¶ 5–10. Plaintiff then instituted the present action on April 11, 1995, mailed defendants a cease and desist letter on April 12, 1995, and faxed them a copy of the complaint on April 19, 1995. On April 21, 1995, defendants responded via fax letter refusing to cease and desist, and contesting the legitimacy of the present action. Plaintiff's request for temporary and preliminary injunctive relief followed on April 24, 1995.

## Discussion

■ In order to justify preliminary injunctive relief in the Second Circuit, the movant must make a "showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2)[i] sufficiently serious questions going to the merits to make them a fair ground for litigation and [ii] a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

■ To succeed in an action under section 43(a) of the Lanham Act, plaintiff must demonstrate that (1) the trade dress at issue is either (a) inherently distinctive, or (b) has

---

not want to produce a chair too similar in design. Apparently, Canal Dover redesigned the Stonehouse chair twice due to its similarities to Stickley's Harvey Ellis chairs before Francher would agree to ship the chairs. Kuder Aff. ¶¶ 17–18; Erickson Aff. ¶¶ 7–10. Following these redesigns, the final version of the Stonehouse chair was shipped to Canal Dover in mid- to late-April 1995.

acquired distinctiveness through secondary meaning, and (2) that there is a likelihood of confusion between the trade dress of the original product and that of the alleged infringer. *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992); *Villeroy & Boch Keramische Werke K.G. v. THC Sys., Inc.,* 999 F.2d 619, 620 (2d Cir.1993). Even where these elements are proven, a defendant may avoid liability by demonstrating that the design elements at issue are functional. *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co., Inc.,* 916 F.2d 76, 79 (2d Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 720 (1991).

■ Although "[a] product's trade dress ordinarily consists of its packaging[,] . . . the design given a product by its manufacturer also may serve to distinguish it from the products of other manufacturers and hence be protectible trade dress." *Wallace,* 916 F.2d at 78. "The trade dress of a product 'involves the total image of a product and may include features such as size, shape, color or color combinations, texture, [or] graphics.'" *Stormy Clime Ltd. v. ProGroup, Inc.,* 809 F.2d 971, 974 (2d Cir.1987) (quoting *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 980 (11th Cir.1983)) (omission in original). Thus, in order to fully evaluate the trade dress of the products whose dress has allegedly been infringed, the Court must examine the overall look of the pieces as depicted in Plaintiff's Exhibits 1.1A to 1.6A. At the Court's request, plaintiff provided a loose description of the dress that appears in these exhibits.[8]

All of the Stickley pieces at issue are designed in the "residential mission style[,] typically of oak or cherry, having sharp, angular,

symmetrical lines creating an overall spartan look and appearance, both collectively and individually." Description of Trade Dress, 1. The most prominent feature of the Spindle pieces[9] is the presence of "centrally grouped equidistant spindles on the back rest and side[ ]" of each piece. The spindles are "inset perpendicular to the top and back rails." *Id.* "Gently curved corbels" support the arms of the armed pieces. The seat cushions are either "leather or a geometric print fabric" and may be inset or slip style. *Id.*

The Harvey Ellis pieces[10] are marked by "[a] back rest having three centrally grouped vertical slats and three non-symmetrically spaced horizontal slats." The "vertical slats" are "inserted perpendicular and between the two lower horizontal slats." *Id.* Plaintiff also makes an "alternative embodiment whereby the vertical back slats are adorned with a contrasting wooden inlay . . ." *Id.*

The "Prairie" Sideboard is an "[e]levated horizontal cabinet" including "a pair of opposed panelled doors with vertical slats." *Id.* Each door has a bell-shaped metal hardware pull attached to a rectangular metal plate on the door. The doors are "separated by three horizontally stacked drawers, the top two drawers essentially equal in height, the bottom drawer being substantially taller than the top two drawers." *Id.* Each drawer has two "symmetrically spaced . . . metal hardware pulls" that are slightly bowed. *Id.* There is also "a solid wooden continuous splash rail along the top back surface of the cabinet."

## A. Irreparable Harm/Likelihood of Success

■ It is well settled that where a plaintiff seeks a preliminary injunction in an action

---

**8.** Defendants strongly object to plaintiff's written descriptions submitted to the Court because, they claim, plaintiff had not previously identified the dress it seeks to protect. Defs' Surreply at 2. However, it is the overall look of the pieces that constitutes the trade dress that plaintiff seeks to protect. *See Stormy Clime Ltd. v. ProGroup, Inc.,* 809 F.2d 971, 974 (2d Cir.1987) (quoting *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 980 (11th Cir.1983)). Plaintiff's photographs of the pieces at issue provide a description of the dress at issue that is more accurate and complete than its verbal descriptions. *See* Complaint, Ex.

A; Plf's Exs. 1.1A–1.6A. The verbal descriptions provided by plaintiff and excerpted herein are intended merely to aid the reader.

No surreply was requested of the defendants, and the Court declines to consider the additional arguments contained therein.

**9.** These pieces include the Spindle Arm Chair, Spindle Side Chair, and the Spindle Settee.

**10.** These pieces are the Harvey Ellis Side Chair and the Harvey Ellis Arm Chair.

under section 43(a) of the Lanham Act, "a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm, assuming that the plaintiff has a protectible mark." *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir. 1988) (citations omitted). A trademark or trade dress is protectible under section 43(a) of the Lanham Act "if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2758. Because this is an application for a preliminary injunction, the Court will first address likelihood of confusion and then evaluate protectibility of the dress at issue.

■ Likelihood of confusion is determined via an overall balancing of the "Polaroid Factors" first enunciated in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492 (2d Cir.) (Friendly, J.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961): (1) the strength of the plaintiff's mark or dress; (2) the similarity between the two marks or dresses; (3) the proximity of the products in the marketplace; (4) the likelihood that the prior owner will bridge the gap between the products; (5) evidence of actual confusion; (6) the defendants' bad faith; (7) the quality of the defendants' product; and (8) the sophistication of the relevant consumer group. *Paddington Corp. v. Attiki Importers & Distribs., Inc.,* 996 F.2d 577, 584 (2d Cir.1993). "[T]he evaluation of the *Polaroid* factors is not a mechanical process 'where the party with the greatest number of factors weighing in its favor wins.' Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Id.* (citations omitted).

*Strength of Plaintiff's Dress*

■ The strength of a mark or dress "is its 'distinctiveness or . . ., or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.'" *Paddington,* 996 F.2d at 585 (citation omitted) (omission in original). Evidence of secondary meaning is probative of the strength of a mark or dress. *Id.* Given the Court's analysis of secondary meaning as set forth in

Part B of this Decision, plaintiff's dress is relatively strong.

*Similarity Between the Two Dresses*

■ This factor examines whether similarities in detail are substantial and differences in detail minimal. *Paddington,* 996 F.2d at 585–86. However, "[m]ore significant than the striking similarities in various details are the dresses' similarity in overall appearance." *Paddington,* 996 F.2d at 586 (citing *Perfect Fit Indus. v. Acme Quilting Co.,* 618 F.2d 950, 954–55 (2d Cir.1980)); *see Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1226 (2d Cir.1987) ("general impression conveyed . . . is the pertinent inquiry").

■ Certainly, the dress of plaintiff's pieces and that of defendants' corresponding pieces differ in some details. Defendants' pieces, made of red oak, are darker and a deeper red than plaintiff's white oak pieces. The patina of the pieces is different as well.

The number of back and side spindles in the parties' spindle pieces differs. Defendants' spindle pieces lack the through tenon joinery of plaintiff's counterparts. Finally, defendants' spindle pieces are more short and squat than plaintiff's, making the former look a bit less angular. In all other respects, however, defendants' three spindle pieces are virtually identical to plaintiff's. The positioning of the rails and spindles, the overall shape of the pieces, the type of geometric pattern on the seat covers, and the "[g]ently curved corbels" supporting the arms are identical. The similarities in overall detail overpower the visual impact of the differences to such an extent that the Court concludes that the dress of defendants' spindle pieces is virtually identical to that of plaintiff's corresponding pieces.

Stickley's Harvey Ellis side and arm chairs are marked by a back rest with three centrally spaced vertical slats. Both defendants' Stonehouse Side Chair and Arm Chair are marked by a back rest with three pairs of centrally grouped vertical slats. A narrow space of one-quarter inch separates the boards in each pair of slats, and the pairs are separated by a larger gap. Although defen-

dants' chairs have six slats, the narrow spacing between the boards in each pair produces a look that approximates the look of plaintiff's chairs. On the other hand, plaintiff's chairs have blind tenons secured by visible pegs, while defendants' chairs have none. The frontboard, backboard and sideboards reveal another difference between the chairs: the bottom edge of these components on the Stickley chairs is curved, while that edge on defendants' chairs is straight.

Even with these differences in detail, the overall similarity of the two *side* chairs is sufficient to weigh in favor of the plaintiff. However, the plaintiff's Harvey Ellis Arm Chair and defendants' Stonehouse Arm Chair are much less similar in overall appearance. The arm supports of plaintiff's chair are straight continuations of the legs, while the arm supports of defendants' chairs are curved, set back from the legs, and attached to the sideboard. These differences give the Stonehouse Arm Chair a different overall appearance than the Stickley Harvey Ellis Arm Chair, with its the stark angularity.

With respect to the sideboard pieces, both are elevated horizontal cabinets that include a pair of opposed panelled doors with vertical slats. Each door has a bell-shaped metal hardware pull attached to a rectangular metal plate on the door. The pulls on defendants' sideboard are more elongated and attached to the top half of the rectangular plate, rather than the bottom half as are plaintiff's. The doors on both pieces are separated by three horizontally stacked drawers. The top two drawers are essentially equal in height, while the bottom drawer is substantially taller than the top two drawers. Each drawer has two symmetrically spaced metal hardware pulls. Plaintiff's pulls are slightly bowed, but more angular than the elliptical shape of defendants' pulls. *Id.* The hardware on both pieces is gunmetal grey. There is also a solid wooden continuous splash rail along the top back surface of the cabinet. The overall appearance of these two pieces is very similar.

The Court finds, therefore, that all of the pieces at issue, with the exception of the Stonehouse Arm Chair and the Stickley Harvey Ellis Arm Chair, are similar in overall appearance resulting in this factor weighing strongly in favor of plaintiff. As to the Stonehouse Arm Chair, the Court is of the opinion that the modifications made to the Harvey Ellis design by the defendants were sufficient to distinguish its overall appearance from that of the Stickley Harvey Ellis Arm Chair.

*Proximity Between the Products in the Marketplace and Likelihood that the Senior User will Bridge the Gap*

This factor concerns whether these products will compete in the same market. *Paddington,* 996 F.2d at 586. If so, the "bridge the gap" factor is irrelevant because the gap has already been bridged. *Id.* "The concern is whether 'it is likely that customers mistakenly will assume either that [the junior user's [11] goods] somehow are associated with [the senior user] or are made by [the senior user].' " *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1226 (2d Cir.1987) (citations omitted) (alterations in original).

Plaintiff has produced evidence that defendants' Stillwater spindle designs are displayed along with plaintiff's spindle pieces without "hang tags" indicating the manufacturer of the furniture. Evearitt Aff. ¶¶ 7–8. Plaintiff has also produced evidence that retail sales people are selling defendants' products as a cheaper but interchangeable alternative to Stickley. Edward Audi Aff. ¶¶ 5, 9; Sedlack Aff, ¶ 4.

The likelihood of consumer confusion may be enhanced by the overlap between the markets in which the parties compete, the middle and high price ranges. Notwithstanding the fact that the price range of Stickley's pieces is above that of Canal Dover, consumers in the market for Mission furniture might assume that defendants' cheaper line is associated with, or made by, Stickley. *Cf. Centaur,* 830 F.2d at 1226 (citing *Lois Sportswear, U.S.A., Inc. v. Levi*

---

11. The junior user is the user that began to use the mark or dress at issue later than the senior user.

*Strauss & Co.*, 799 F.2d 867, 874 (2d Cir. 1986)). Such confusion is more than likely given the relative strength of plaintiff's dress. *See id.* (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir.1987)). Thus, this factor favors plaintiff.

*Evidence of Actual Confusion*

■ This factor concerns whether consumers have actually been confused as to the source of the products at issue. *Centaur*, 830 F.2d at 1227. Such evidence is usually anecdotal or in the form of consumer surveys. *Id.* Plaintiff submits no evidence of actual consumer confusion. Rather it relies upon the placement of defendants' pieces along with Stickley furniture on the showroom floor. Evearitt Aff. ¶¶ 7–8. This amounts to mere speculation about possible actual confusion. This factor, therefore, favors defendants. However, "[e]vidence of actual confusion is not required to prove the likelihood of confusion between the two [dresses]." *Centaur*, 830 F.2d at 1227.

*Defendants' Bad Faith*

■ Intentional copying by a defendant creates a presumption that the copier has succeeded in causing confusion. *Paddington*, 996 F.2d at 586–87. Actual or constructive knowledge of the prior user's mark may indicate bad faith, particularly "[w]here such prior knowledge is accompanied by similarities so strong that it seems plain that deliberate copying has occurred." *Id.* at 587 (citations omitted). This is because "'the second comer has a duty to so ... dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer.'" *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir.1987) (quoting *Harold F. Ritchie Inc. v. Chesebrough–Pond's, Inc.*, 281 F.2d 755, 758 (2d Cir.1960)).

■ Mission furniture had not been manufactured for almost 70 years when, in 1989 Stickley first introduced reproductions of the G. Stickley original designs. The defendants' introduction of virtually identical pieces into the market for Mission furniture implies that they intentionally copied the dress at issue.

Defendants assert that they designed and manufactured their furniture based solely upon illustrations from furniture history books, without reference to plaintiff's pieces or any of the original pieces. However, Charles Kuder, President of Canal Dover, stated that the introduction of Canal Dover's mission-style line in 1991–92 was partially motivated by the success of plaintiff's Mission Collection.[12] Because Stickley's Mission Collection was introduced in 1989, Kuder's statement is virtually an admission of actual knowledge of plaintiff's trade dress. Thus, even if defendants based their designs upon pictures of Gustav's originals, it seems clear that they had knowledge that plaintiff was already producing those exact pieces, and had been successful in doing so. Furthermore, Stickley's sideboard piece at issue here was a new design by Stickley, introduced as part of the 1989 Mission Collection. Although a G. Stickley design for a somewhat similar sideboard existed in the public domain before 1989, defendants' sideboard bears much closer resemblance to plaintiff's newly designed Sideboard than that depicted in the original G. Stickley design. *See* Defs' Hearing Ex. B; Plf's Hearing Exs. 1.6A, 1.6B.

The Court finds, therefore, that plaintiff has established evidence indicating that defendants have failed in their "duty to so ... dress [their] product as to avoid all likelihood of consumers confusing it with the product of the 'first comer.'" *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir.1987); *see Imagineering, Inc. v. Van Klassens, Inc.*, 53 F.3d 1260, 1265–66 (Fed. Cir.1995). Therefore, this factor weighs in favor of the plaintiff and gives rise to the

---

**12.** "In 1991–92, numerous retailers and CANAL DOVER sales representatives reported to me that 'mission style' furniture had become a 'hot' item. In numerous conversations with dealers and representatives, I found that although numerous companies were selling mission style dining room, bedroom, upholstered, and occasional furniture, the two having the most success were L. & J.G. Stickley, Inc. with its MISSION OAK line, and Bassett Furniture Industries, Inc. with the line known as LEGEND." Kuder Aff. ¶ 2.

presumption that defendants have succeeded in causing confusion.[13]

*Quality of Defendants' Products*

 Generally, "[t]he lack of marked difference in quality between goods supports the inference that they emanate from the same source." *Centaur,* 830 F.2d at 1228. "[A] junior user's product of equal quality to a senior user's product injures the senior user by the increased tendency of similar quality products to promote consumer confusion." *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 78 (2d Cir.1988) (citations omitted).

The difference in quality between defendants' and plaintiff's pieces would be generally apparent upon visual inspection by a sophisticated consumer. However, defendants maintain that their furniture pieces and those of plaintiff are of comparable "structural integrity and overall quality." Defs' Memo. at 26–27; Erickson Aff. ¶ 5. Such a contention supports a finding of likelihood of confusion. Moreover, to the extent that defendants' products are of inferior quality, Stickley's goodwill and reputation may be at risk "insofar as consumers might think that the source of the inferior product is the senior user." *Hasbro,* 858 F.2d at 78 (2d Cir.1988) (citations omitted); *Imagineering,* 53 F.3d at 1265–66. This factor, therefore, favors plaintiff.

*Sophistication of the Relevant Consumer Group*

 A high degree of consumer sophistication in the relevant market usually militates against a finding of likelihood of confusion. *Centaur,* 830 F.2d at 1228. Even the defendants' middle price-range furniture would constitute a major purchase for most consumers, who probably approach the purchase of furniture with some caution and sophistication. However, the more identical the products, the less heavily a high degree of consumer sophistication weighs. *See id.* The overall appearance of the spindle pieces, the Harvey Ellis and Stonehouse side chairs, and the sideboards is so similar that even a sophisticated purchaser might be confused as to their source. Therefore, this factor as to those pieces would only weigh slightly in favor of defendants.

 Based upon the above analysis and a balancing of all the factors, the Court finds that the plaintiff has satisfied its burden of demonstrating that the relevant consumer group is likely to be confused as to source by the defendants' Stillwater spindle pieces, Stonehouse Side Chair, and the sideboard piece vis-á-vis Stickley's Mission Collection. Therefore, as to those pieces plaintiff has established both irreparable harm and a likelihood of success on the merits, assuming that the dress is protectible. With respect to the defendants' Stonehouse Arm Chair, on the present facts the Court does not find sufficient evidence of likelihood of confusion. The plaintiff has failed, therefore, to carry its burden of proof as to that piece.

The Court must next evaluate whether the Stickley's trade dress is protectible under the Lanham Act.

**B. Protectibility of Stickley's Trade Dress**

 As stated, a trademark or trade dress is protectible under section 43(a) of the Lanham Act "if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2758. The Court will first address secondary meaning.[14]

---

**13.** However, defendants redesigned the Stonehouse Arm Chair twice to distinguish it from the Harvey Ellis Arm Chair. These two pieces are not confusingly similar in overall appearance. Thus, with respect to this piece plaintiff is not entitled to the presumption that defendants have succeeded in causing confusion.

**14.** Defendants argue that plaintiff cannot satisfy the various elements of a trade dress claim because the designs at issue were and are in the public domain. This argument is pervasive in defendants' submissions, appearing primarily in their discussion of inherent distinctiveness, but extending to their analysis of secondary meaning and likelihood of confusion. This argument generally begs the question.

A thing is in the public domain only if no intellectual property right protects it. The fact that only one form of intellectual property right does not cover a certain creation does not permit one to leap to the conclusion that the creation is in the public domain.

. . . .

■ Secondary meaning arises when a trade dress has "come through use to be uniquely associated with a specific source." *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. at ——, 112 S.Ct. at 2756. To establish secondary meaning "a manufacturer must show that, in the minds of the public, the primary significance of a product feature ... is to identify the source of the product rather than the product itself." *Id.*

■ "[T]he crux of the doctrine of secondary meaning 'is that the mark comes to identify not only the goods but the source of those goods,' even though the relevant consuming public might not know the name of the producer." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1221 (2d Cir.1987) (citation omitted). In order to evaluate secondary meaning, courts analyze the following factors: (1) advertising expenditures, (2) consumer studies linking the dress to a source,[15] (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the dress, and (6) length and exclusivity of the dress's use. *Centaur,* 830 F.2d at 1222. No single factor is determinative and every factor need not be proved. *Id.*

Additionally, plaintiff must demonstrate that its dress "had acquired secondary meaning before its competitor commenced use of the [dress]." *PaperCutter Inc. v. Fay's Drug Co.,* 900 F.2d 558, 564 (2d Cir.1990) (citations omitted); *Calvin Klein Co. v. Farah Mfg. Co.,* 229 U.S.P.Q. 795, 800, 1985 WL 3953 (S.D.N.Y.1985). As stated above, de-

fendants first entered the market with their mission-style furniture in April 1993.

*Advertising Expenditures*

Plaintiff has submitted evidence of substantial advertising expenditures for the entire Mission Collection. Since 1989, Stickley has spent $3.4 million ($1.2 million in 1994 alone) on advertising its Mission Collection in "various newspapers and national magazines, ... radio[,] and television...." Am. Audi Aff. ¶ 13. From 1989 through the end of 1992, plaintiff spent $1.15 million advertising its Mission Collection. In 1993 Stickley's advertising expenditures were about $512,-000. Am.Audi Aff. ¶ 13.

Defendants argue that plaintiff's failure to tie its advertising expenditures to the pieces at issue here weighs against plaintiff. However, at the preliminary injunction stage courts merely look to whether the advertising has been "extensive" or "substantial." *LeSportsac, Inc. v. K Mart Corp.,* 607 F.Supp. 183, 185 (E.D.N.Y.1984), *aff'd,* 754 F.2d 71, 78 (2d Cir.1985). The Court concludes that Stickley's advertising expenditures are indeed substantial, and this factor favors plaintiff. Defendants' argument that plaintiff's failure to demonstrate that it has used "look for" advertising[16] militates against Stickley on this prong is unavailing. *See Devan Designs, Inc. v. Palliser Furniture Corp.,* 25 U.S.P.Q.2d 1991, 1997, 1992 WL 511694 (M.D.N.C.1992), *aff'd,* 27 U.S.P.Q.2d 1399, 1993 WL 243677 (4th Cir. 1993).[17]

....
One cannot come to the bottom-line conclusion that any item is "in the public domain" until one has exhausted all of the possible areas of exclusive rights.
1 *McCarthy on Trademarks and Unfair Competition,* § 1.15[6] (3d ed. 1995).
Neither does a determination that a creation is in the public domain forever banish the creation to existence there. This is evidenced by the fact that generic marks may be reclaimed from the public domain. *See Singer Mfg. Co. v. Briley,* 207 F.2d 519 (5th Cir.1953) (Singer mark "recaptured" from the public domain).
"The fact that a ... design has fallen into the public domain should not preclude protection under the trademark laws so long as it is shown to have acquired independent trademark significance, identifying in some way the source or sponsorship of the goods." *Frederick Warne &*

*Co., Inc. v. Book Sales Inc.,* 481 F.Supp. 1191, 1196 (S.D.N.Y.1979).

**15.** Neither party produced any evidence of consumer studies on the issue of secondary meaning.

**16.** This is advertising that calls the consumer's attention to the product feature claimed as trade dress, promoting an association between feature and source.

**17.** *Devan Designs* is distinguishable because there the plaintiffs provided the court with no information regarding advertising expenditures. *Devan Designs,* 25 U.S.P.Q.2d at 1997. The only information provided to the court was examples of ads placed mostly by retailers and not the manufacturer, many of which did not identify the source of the products advertised. *Id.* Hence, the court's concern that the advertising there did not point directly enough to source.

*Unsolicited Media Coverage of the Product*

Plaintiff has produced a very substantial amount of unsolicited media coverage of its Mission Collection (290 appearances in print media). Am. Audi Aff., Ex. B. About 30% of this coverage has concerned the pieces at issue. Am.Audi Aff. ¶ 10. Additionally, Stickley furniture, including the Mission Collection, has been featured in movies and television shows like "A River Runs Through It," "Dead Again," "Thirtysomething," "Mad About You," "Bob," and "Grace Under Fire." Am. Audi Aff. ¶ 11.

Defendants contend that the proffered coverage is entitled to little weight because many of the articles were dated after Canal Dover entered the Mission market. It is true that plaintiff must demonstrate that its dress had acquired secondary meaning in the minds of the consuming public at the time that the defendants adopted the allegedly infringing dress. *See PaperCutter Inc. v. Fay's Drug Co.*, 900 F.2d 558, 564 (2d Cir. 1990) (citing cases). However, no less than 250 of the proffered appearances in print media were published prior to defendants' use of the allegedly infringing dress. Am. Audi Aff. Ex. B. This factor weighs in favor of the plaintiff.

*Sales Successes*

The Mission Collection as a whole accounts for approximately 74% of Stickley's sales. Al.Audi Aff. ¶ 4; Am. Audi Aff. ¶ 12. In 1989 this figure stood at 18%. Am. Audi Aff. ¶ 12. By the end of 1992 this figure had risen to 56% and in 1993 it stood at 65%. *Id.* The pieces at issue here rank in the top ten for sales of pieces in Stickley's Mission Collection and, together, produced over $3.4 million in sales in 1994. Al.Audi Aff. ¶ 4. This factor favors the plaintiff.

*Attempts to Plagiarize the Dress*

██ Intentional copying of plaintiff's dress is the most persuasive factor in favor of finding secondary meaning. *Centaur*, 830 F.2d at 1224; *LeSportsac*, 607 F.Supp. at 185. Intentional copying may be inferred where competitors are selling identical products in the same market. *20th Century Wear, Inc. v. Sanmark–Stardust, Inc.*, 747 F.2d 81, 91 (2d Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985).

For the reasons discussed in Part A of the Court's Decision under "Defendants' Bad Faith," the Court finds that this factor favors the plaintiff.

*Length and Exclusivity of the Dress's Use*

No other furniture manufacturers were commercializing the same furniture in 1989 when Stickley introduced its Mission line. Defendants began selling their Mission-style furniture in April 1993. Bassett began selling its Mission-style line in 1991. Therefore, plaintiff's dress enjoyed relatively short exclusive use. However, "no absolute time span can be posited as a yardstick in cases involving secondary meaning." *Centaur*, 830 F.2d at 1225. Although "a product design may take longer than a wordmark to acquire secondary meaning," *PAF S.r.l. v. Lisa Lighting Co., Ltd.*, 712 F.Supp. 394, 407 (S.D.N.Y.1989), the Arts and Crafts mania and the associated widespread publicity of Mission furniture, prominently featuring Stickley's pieces, leads the Court to conclude that this factor weighs in favor of the plaintiff.

Since a balancing of the above factors favors the plaintiff, the Court finds that plaintiff has succeeded in demonstrating a likelihood that its trade dress is protectible under the Lanham Act, having acquired distinctiveness through secondary meaning. The Court must next evaluate whether defendants may insulate themselves from the issuance of a preliminary injunction by demonstrating that the dress at issue is functional.

**C. Functionality**

██ Defendants may defeat plaintiff's claims under § 43(a) of the Lanham Act if they demonstrate that the trade dress allegedly infringed is merely "functional." *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co., Inc.*, 916 F.2d 76, 79 (2d Cir. 1990). In the Second Circuit, functionality is a defense that must be pleaded and proved by defendant. *LeSportsac*, 754 F.2d at 76. Dress may be functional either in the "utilitarian" sense or the "aesthetic" sense.

■ As to utilitarian functionality, a functional feature is one that "is essential to the use or purpose of the article or [that] affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982). A feature is *essential* "only if the feature is dictated by the functions to be performed; a feature that merely accommodates a useful function is not enough." *LeSportsac*, 754 F.2d at 76. A design feature *affects the cost or quality* of an article where it "permits the article to be manufactured at a lower cost" or "constitutes an improvement in the operation of the goods." *Id.* As to their defense of utilitarian functionality, defendants have failed to demonstrate either that plaintiff's dress is "dictated by the functions to be performed" or that plaintiff's dress uniformly causes its products to be manufactured at a lower cost or improves their operation. *Brandir Int'l, Inc. v. Cascade Pac. Lumber Co.*, 834 F.2d 1142, 1148 (2d Cir.1987).

■ Even trade dress that is non-functional in the utilitarian sense can be "aesthetically functional," and thus fail to merit protection. The focus of this inquiry is whether "trade dress protection upon a particular *arrangement of features* will hinder competition or impinge upon the rights of others to compete effectively in the sale of goods." *Wallace Int'l*, 916 F.2d at 79 (quoting *Stormy Clime Ltd v. ProGroup, Inc.*, 809 F.2d 971, 976–77 (2d Cir.1987)) (internal quotations and citations omitted) (emphasis supplied). "[A] 'design is functional because of its aesthetic value only if it confers a significant benefit that cannot practically be duplicated by the use of alternative designs.'" *Villeroy & Boch Keramische Werke K.G. v. THC Sys., Inc.*, 999 F.2d 619, 621 (2d Cir.1993) (citing Restatement (Third) of Unfair Competition, § 17, cmt. c). In order to prevail in its aesthetic functionality argument defendants must show that without the specific arrangement of features of plaintiff's dress, "it is at a significant competitive disadvantage in making the initial sale." *Villeroy*, 999 F.2d at 621.

Defendants have not proffered evidence showing that plaintiff seeks protection for the "basic elements of a style that is part of the public domain." Rather the evidence is consistent with plaintiff seeking protection of a "precise expression of a decorative style" that would allow defendants to compete effectively in the same market as long as they did not utilize plaintiff's particular arrangement of elements. *Wallace Int'l*, 916 F.2d at 81. Thus, for the purposes of this motion, defendants have failed to satisfy their burden of establishing that functionality is likely to constitute a successful defense to plaintiff's cause of action.

### Conclusion

The Court finds that, by demonstrating a likelihood of confusion, plaintiff has shown that it will be irreparably harmed if the injunction does not issue. Further, plaintiff has demonstrated that it is likely to succeed at trial in proving that its dress is protectible, having acquired secondary meaning, and that a likelihood of confusion exists. Therefore, it is hereby

ORDERED, that defendants are preliminarily enjoined from

a) displaying, advertising, or shipping furniture which resembles the trade dress of Stickley's Mission Collection furniture including the pieces set forth in Appendix A to this Decision and Order, so as to be likely to cause confusion, mistake, or deception in connection with the source of the furniture; and

b) shipping furniture listed in Appendix B to this Decision and Order. It is further

ORDERED, that the temporary restraining order presently in effect is dissolved upon the entry of this order. It is further

ORDERED, that this preliminary injunction shall be conditioned upon the giving of security by the plaintiff, in addition to the cash bond or certified check already posted, in the sum of fifty thousand & 00/100 Dollars ($50,000) cash bond or certified check for a total of one hundred thousand and 00/100 dollars ($100,000) to be placed in the Court registry for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined.

**IT IS SO ORDERED.**

## APPENDIX A

*Stickley Furniture*

| | |
|---|---|
| 89–286 | Spindle Settee Oak |
| 91–286 | Spindle Settee Cherry |
| 89–376 | Spindle Arm Chair Oak |
| 91–376 | Spindle Arm Chair Cherry |
| 89–384 | Spindle Side Chair Oak |
| 91–384 | Spindle Side Chair Cherry |
| 89–354 | Harvey Ellis Side Chair Oak |
| 91–354 | Harvey Ellis Side Chair Cherry |
| 89–711 | Sideboard Oak |

## APPENDIX B

*Canal Dover Furniture*

| | |
|---|---|
| A–1301 | Stillwater Arm Chair |
| CA–1351 | Stillwater Arm Chair |
| S–1300 | Stillwater Side Chair |
| CS–1350 | Stillwater Side Chair |
| CA–6751 | Stillwater Bench |
| A–6701 | Stillwater Bench |
| CA–6751 | Stonehouse Side Chair [18] |
| CA–6751 | Sideboard [19] |

18. *See* Plf's Ex. 1.4B; Defs' Hearing Ex. A.

19. *See* Plaintiff's Ex. 1.6B.