**PAPERCUTTER, INC.,**
Appellant–Cross–Appellee,

v.

**FAY'S DRUG CO., INC.,**
Appellee–Cross–Appellant.

**Nos. 280, 336, Dockets 89–7461, 89–7509.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 22, 1989.

Decided April 4, 1990.

Mark P. Stone, Stamford, Conn. (Eric Y. Munson, of counsel), for appellant-cross-appellee.

Richard Z. Lehv, Weiss Dawid Fross Zelnick & Lehrman, P.C., New York City (Barbara A. Solomon, of counsel), for appellee-cross-appellant.

Before OAKES, Chief Judge, TIMBERS and CARDAMONE, Circuit Judges.

OAKES, Chief Judge:

This is an appeal by a trademark holder from a judgment in favor of the defendant in an action alleging trademark infringement, with a cross-appeal by the defendant seeking cancellation of the plaintiff's registration of the trademark. The United States District Court for the Southern District of New York, Charles L. Brieant, Jr., Chief Judge, after a bench trial, held in an oral ruling that there was no infringement of the trademark "PaperCutter" by the defendant's operation of its fourteen upstate New York stores named The Paper Cutter, but upheld the registration of the mark, finding that

> [w]hile there's a strong [element] of description in the mark, and it may be a little bit weak, ... it has been shown to be associated by consumers with this source, or there was enough activity by these proprietors of the mark to lead one to infer that it must have been associated by at least some customers with a single source.

Taking this as finding that the mark was descriptive but nevertheless valid because it had acquired secondary meaning, we reverse on the cross-appeal, because the evidence is insufficiently strong under the authorities of this circuit to support a finding of secondary meaning. We agree with the district court, however, that there was no

infringement, even if this were a valid mark. Accordingly, we affirm on the main appeal.

Plaintiff's principals are Dora Schaefer Cassety and Harold Cassety, who have for some years run an interior design firm on West 39th Street in Manhattan called Schaefer Cassety Inc. ("SCI"). Several years ago Harold Cassety began designing paper ornaments or "paper cuts" to send as promotional pieces to SCI customers. These cuts consisted of folded paper that became three dimensional when unfolded and that basically could be used as Christmas tree ornaments, free-standing party decorations, greeting cards, and perhaps in other ways as well.

In 1983, the Cassetys decided that their paper designs and cut-outs would make a good supplemental business, and they incorporated PaperCutter, Inc. PaperCutter made no sales in 1983, and in May 1984 the Cassetys exhibited prototypes of their paper cuts at a trade show in Manhattan. Among the displayed cuts were a static star, an art deco Santa, a small-starred fir tree, Santa's tuba, triple bells, an oval ornament, a stream of stars, and a bundled snowman. PaperCutter distributed catalogues and price lists at the trade show and took some orders at or after the show. The first shipment fulfilling the purchase orders was made on October 23, 1984, by which time PaperCutter had arranged to have an inventory manufactured by the use of a die-cutting machine. A large sign bearing the mark "Papercutter" with a logo showing a long pair of shears cutting paper was on display at the trade show.

The Cassetys' own figures indicate that PaperCutter made retail sales of $145 and wholesale sales of $2,968 in 1984; retail sales of $143.75 and wholesale sales of $4,545 in 1985; retail sales of $92 and a sale to the Boston Museum of Fine Art of $21,208 in 1986. Also in 1986, PaperCutter received a commission of $1,252.39 on a piece it designed for the Museum of Modern Art ("MOMA"), but the item did not bear any PaperCutter mark or label. PaperCutter's retail sales in 1987 were only $41, but it also received an additional $383 royalty from MOMA. Sales in 1988 were $110 on the eve of trial. PaperCutter never did any consumer advertising, and although the Cassetys claim that its lack of activity in 1986, 1987, and 1988 was due to defending against appellee's opposition proceeding in the United States Patent and Trademark Office, much of the original 1984 inventory of paper cuts remains unsold.

Defendant Fay's Drug Company, Inc., operates a chain of more than 150 "super drugstores" located in upstate New York, Pennsylvania, Connecticut, and Massachusetts, but none in the New York City metropolitan area. A trademark search conducted by defendant revealed, as of August 8, 1984, that there were books with the name *Papercutting* and *Paper Cut-out Design*, and that there were business titles including "Pappercutter, Inc.," the plaintiff's name, albeit misspelled, in Manhattan, "The Paper Cutter" in Newton, Massachusetts, and "Papercutters" in Greenville, South Carolina. A July 1985 update to the search report indicated that plaintiff had applied for a registered mark covering paper sculptures, paper ornaments, paper decorations, paper labels, paper tags, greeting cards, writing paper and envelopes, gift wrapping material and catalogues. Despite the findings of the initial search report, defendant went ahead with its plans to operate a chain of stores called The Paper Cutter, and opened its first store to the public in Albany on October 23, 1984, the same day that the plaintiff made its first shipment of paper cuts to a customer from the trade show. By the time of trial, defendant was operating fourteen The Paper Cutter stores, all in upstate New York.

On signs, in its advertising, and on the price stickers affixed to its goods, defendant uses a logo showing a short pair of scissors, perhaps children's scissors, about to cut a dollar sign, suggesting, as is the case, that The Paper Cutter stores sell at a discount their particular line of office supplies, party supplies, greeting cards, books, and novelties. As the district court found, in contrast to plaintiff's "highly artistic up-scale item involving genuine artistic ef-

fort, ... [which] is highly priced," defendant's paper goods

are essentially items at the low end of the scale, [are] mass produced, fold-out type of things, such as center pieces for a graduation party; for a baby shower, one containing a stork; for graduation, containing a wise owl with an academic hat; and similar paper items all of which were sold with a brand name of the place of origin, which is not the defendant Paper Cutter or the plaintiff.

On May 13, 1985, plaintiff filed an application to register its mark with the United States Patent and Trademark Office ("PTO"). On September 10, 1985, plaintiff's attorney wrote to the defendant, warning that defendant's use of the name The Paper Cutter constituted an infringement of plaintiff's trademark rights. Defendant responded to the plaintiff's letter that same month, denying that there was an infringement and suggesting that the parties execute a licensing agreement under which both would be allowed to use the name. Plaintiff never responded to defendant's suggestion.

On or about September 20, 1985, the PTO issued a notice of publication stating that plaintiff's proposed mark would be published on October 8, 1985, for purposes of opposition. The defendant filed a notice of opposition, and Trademark Opposition No. 73,750 was commenced on May 12, 1986. The opposition was later dismissed with prejudice by the PTO's Trademark Trial and Appeal Board, by order dated March 23, 1988, after defendant failed to file a response to plaintiff's motion to dismiss asserting that Fay's had no standing to maintain the opposition proceeding. Thereafter, on August 23, 1988, the United States Trademark and Service Mark Registration No. 1,501,275 was issued to Paper-Cutter.

Meanwhile, on December 18, 1987, plaintiff filed this action against defendant alleging common law trademark infringement and unfair competition under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), and amended its complaint on November 7, 1988, after the registration of the mark, to add a claim for infringement of the registration. Defendant's answer to the amended complaint asserted various affirmative defenses and sought cancellation of the registration on grounds that plaintiff had never used PaperCutter as a trademark on its goods, that plaintiff's mark did not merit protection because it was descriptive and had not acquired secondary meaning, that plaintiff had made false statements and overstated the goods and services it offered in its application for registration of the mark, and that plaintiff had abandoned any rights to exclusive use of the mark under section 45 of the Lanham Act, 15 U.S.C. § 1127 (1988), which provides that nonuse for two consecutive years is prima facie evidence of abandonment. We concern ourselves only with the descriptiveness of the mark and the proof of secondary meaning, consideration of all other defenses being unnecessary to resolution of this case.

## DISCUSSION

We start with a few fundamentals. Although trademarks are often referred to as a form of property, or more specifically as "intellectual property," we recently reaffirmed that " '[t]here is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed.' " *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 581 (2d Cir.1990) (quoting *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918)). Beyond preventing a mark-holder's goods from being confused with those of others and preventing trade from being diverted to competitors through the use of misleading marks, therefore, an entity has no right to appropriate a particular phrase or word for its exclusive use in the marketplace.

However difficult of definition, the courts, including ours, have basically maintained four different categories of terms with respect to trademark protection: (1) generic terms, which refer to the genus or class of which the product is a species, and are not entitled to protection even with

proof of secondary meaning, i.e., proof that the public has come to associate the term with a particular source; (2) descriptive terms, which convey an immediate idea of some characteristic or attribute of the product and are entitled to protection with proof of secondary meaning; (3) suggestive terms, which require some imagination on the part of the consumer to ascertain the nature of the product, and are thus distinctive enough to be entitled to protection even without proof of secondary meaning; and (4) arbitrary or fanciful terms, which are so distinctive and indicative of a product's source, rather than its qualities or attributes, that they, unlike suggestive terms, enjoy trademark protection without the need of debating whether they are "merely descriptive." *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9–11 (2d Cir.1976) (Friendly, J.).

Underlying the distinctions among the four categories of terms is an attempt to prevent consumer confusion concerning the source of goods and to encourage businesses to invest in quality goods by protecting their generated good will and customer loyalty from would-be imitators, but at the same time to avoid unduly impeding the free flow of information in the marketplace that results from exclusive appropriation of terms by particular businesses. Because terms unrelated to the characteristics or class of the product are less useful to competitors selling similar products and more likely to conjure up the source of the product, we grant trademark protection to arbitrary, fanciful, and suggestive terms, without further inquiry, but not to descriptive and generic terms.

As between descriptive and generic terms, conventional wisdom holds that generic terms, which refer to the general class or category of the product, are so useful to businesses selling the same product that no amount of money poured into promoting customers' association of generic terms with a particular source can justify "depriv[ing] competing manufacturers of the product of the right to call an article by its name." *Abercrombie & Fitch*, 537 F.2d at 9 (citation omitted). As to descriptive terms, "[a] person cannot, by mere adoption and use, obtain exclusive rights in words that describe the attributes of the goods, services, or business to which the words are applied" for the simple reasons that prospective purchasers are likely to understand such terms in their descriptive sense rather than as an indication of source and that the terms are likely to be useful to competing manufacturers. *See Restatement (Third) of Unfair Competition* § 14 comment a, at 57 (Tent. Draft No. 2 1990). However, descriptive terms may, unlike generic terms, become entitled to protection if the "descriptive meaning" of a word becomes subordinate and the term instead becomes primarily a symbol of identification, a process by which, put another way, the term acquires "secondary meaning." *See id.* at 58. *But cf.* R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 18.03 at 12–13 (L. Altman 4th ed. 1983) (arguing that there should be no distinction between generic and descriptive marks and that generic marks should also be entitled to protection upon proof of secondary meaning).

These concepts, as incorporated into the Lanham Act, by which we are governed, are to the effect that "[n]o trade-mark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it ... [c]onsists of a mark which ... when used on or in connection with the goods of the applicant is merely descriptive ... of them." 15 U.S.C. § 1052(e)(1) (1988). An exception to this, however, is when the mark used "has become distinctive of the applicant's goods in commerce," i.e., when the mark has acquired secondary meaning. *See* 15 U.S.C. § 1052(f) (1988).

■ Fay's Drug Company argues on appeal that PaperCutter's trademark registration is invalid because its mark is merely descriptive and has not acquired secondary meaning. Although a certificate of registration, once issued, is prima facie evidence that the registered mark is valid, such registration does not "preclude another person from proving any legal or equitable defense or defect ... which might have been

asserted if such mark had not been registered." 15 U.S.C. § 1115(a) (1988). Here, the Patent and Trademark Office issued PaperCutter's trademark registration without rejecting the mark as merely descriptive and without requiring proof of secondary meaning. Concededly, "the decision of the Patent and Trademark Office to register a mark without requiring proof of secondary meaning affords a rebuttable presumption that the mark is more than merely descriptive." *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1132 (2d Cir.1979) (citing *Abercrombie & Fitch*, 537 F.2d at 11; *West & Co. v. Arica Inst., Inc.*, 557 F.2d 338, 342 (2d Cir.1977) (per curiam)). At the same time, the defendant may petition for cancellation of the plaintiff's registration under section 14 of the Lanham Act, 15 U.S.C. § 1064 (1988), "either in a separate and independent action or as a counterclaim in an infringement suit," *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 373 (1st Cir.1980), by rebutting the presumption of a plaintiff's right to exclusive use of a registered mark by a preponderance of the evidence. *See 20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 747 F.2d 81, 88–89 n. 8 (2d Cir.1984) (citing *Dan Robbins & Assoc., Inc. v. Questor Corp.*, 599 F.2d 1009, 1013–14 (C.C.P.A.1979)), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985). The presumption may be rebutted by a showing that the mark is descriptive, not suggestive. *See 20th Century Wear*, 747 F.2d at 88–89 n. 8.

■ We have no doubt that "PaperCutter" is purely descriptive of the work done by the corporation formed by Cassety and Schaefer. There is no suggestion that the mark is generic, since "papercutter" is not the name of the product. To argue, however, that the term in reference to the goods is thereby made suggestive, thus entitling it to trademark protection, is to miss the boat. Even though one would not call the product or goods a papercutter, one would refer to them as paper cuts, and the evidence was strong that this is what they were considered to be.

■ Descriptive terms are distinguished from suggestive terms by evaluation of what prospective purchasers perceive in terms of an indication of source, as well as the potential impact on competitors of the appropriation of the term as a trademark by a particular seller. *See Restatement, supra,* § 14 comment b, at 62. We have noted a "useful standard" for distinguishing the terms:

> "A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods."

*Abercrombie & Fitch,* 537 F.2d at 11 (quoting *Stix Prods., Inc. v. United Merchants & Mfrs., Inc.,* 295 F.Supp. 479, 488 (S.D.N.Y.1968)). A recent comment has put it somewhat differently:

> Marks that describe an aspect of a product are known as "descriptive." Marks that do not describe the product but call to mind some attribute of it are called "suggestive." Examples of descriptive marks are CUSTOM–BLENDED for gasoline or GAS–BADGE for a badge to monitor gaseous pollutants. A good example of a suggestive mark is GLEEM for toothpaste. The line between descriptive and suggestive marks is quite a difficult one to draw, and new entrants to product markets often stray quite close to it.

Carter, *The Trouble With Trademark,* 99 Yale L.J. 759, 771 (1990). Examples of descriptive terms are terms conveying "the characteristics of the goods, services, or business," or indicating the purpose, functions, size, quantity, capacity, or merits of a product, the effects of its use, or the class of intended purchasers. *See Restatement, supra,* § 14 comment a, at 58.

It should be explained that the craft of papercutting, according to expert testimony adduced by defendant, is centuries old, coming from the Far East, and that a paper cut is simply a design cut out of paper with scissors, a knife, or a die-cutting press. There is a Guild of American Papercutters

and a magazine called *Papercutting World*. The plaintiff's products are paper cuts, and Mr. Cassety and his company are commonly known as papercutters. In a very real sense, therefore, the term "PaperCutter" "directly conveys information about a product or business, other than information about its source or association with a particular entity." *Id.* § 14 comment a, at 58. It also describes the characteristics of the business and hence of the product. At best it is a variant or a corruption of the term "paper cut" and, as such, retains its descriptive character. *See id.* § 14 comment a, at 60.

The trial court, although its findings were not clear in this regard, held as much by saying that "there is a strong [element] of description in the mark, and it may be a little bit weak." However, the district court then confused the issue somewhat by saying that it did not think the word "PaperCutter" is so generic as to prevent its use in the fashion as plaintiff sought to do here. The real issue should have been for the district court, as it is for us, whether plaintiff proved "secondary meaning."

■ On the issue of secondary meaning, we look to see whether the registrant's appropriation of the mark conferred subsequent significance to the previous meaning of the term, and this depends on whether a significant number of prospective purchasers understand the term when used in connection with the particular kinds of goods involved in the registration certificate as indicative of an association with a specific entity. In other words, if the term, although not inherently distinctive, comes through use to be uniquely associated with a single source, it is entitled to protection under the same principles applicable to inherently distinctive designations. *See id.* § 13 comment e, at 43. "The crucial question in a case involving 'secondary meaning' always is whether the public is moved in any degree to buy an article because of its source." *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 663 (2d Cir.1979) (citation omitted), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). To qualify for trademark protection, an owner of a descriptive mark must demonstrate that the mark had acquired secondary meaning before its competitor commenced use of the mark. *See Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir.1980); *accord Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir.1985); *20th Century Wear*, 747 F.2d at 90.

■ The existence of secondary meaning is a question of fact with the burden of proof on the party claiming exclusive rights in the designation. *See 815 Tonawanda Street Corp. v. Fay's Drug Co.*, 842 F.2d 643, 647–48 (2d Cir.1988). This burden does not shift upon a decision of the Patent and Trademark Office to register the mark, absent evidence that the Office registered the mark upon finding that it had acquired secondary meaning. *See 20th Century Wear*, 747 F.2d at 88–89 n. 8. "Proof of secondary meaning entails vigorous evidentiary requirements," *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F.Supp. 129, 134 (S.D.N.Y.1972), and may be established by either direct or circumstantial evidence, including survey evidence of a representative sample of consumers, *see American Footwear Corp.*, 609 F.2d at 663, none of which was adduced here. Secondary meaning may also be inferred from evidence relating to the nature and extent of the public exposure achieved by the designation, including volume of sales, *see Harlequin Enters. v. Gulf & Western Corp.*, 644 F.2d 946, 949 & n. 1 (2d Cir. 1981), length of time of use, *see Saratoga Vichy Spring Co. v. Lehman*, 491 F.Supp. 141, 150 (N.D.N.Y.1979), *aff'd*, 625 F.2d 1037 (2d Cir.1980), and advertising and other promotional efforts, with commercial success, rather than the amount of expenditures, being the likely measure. *See American Footwear Corp.*, 609 F.2d at 663. Proof of intentional copying is often viewed as evidence of secondary meaning on the theory that the copying is motivated by a desire to benefit. *See Harlequin Enters.*, 644 F.2d at 950; *Perfect Fit Indus. v. Acme Quilting Co.*, 618 F.2d 950, 954 (2d Cir.1980).

To the extent the district court found that secondary meaning had been established, we think its findings were clearly erroneous, but we say "to the extent" advisedly because what the district court said was that it "believes that at least within the context of this particular type of product in this industry and this case, ... it has been shown to be associated by consumers with this source, or there was enough activity by these proprietors of the mark to lead one to infer that it must have been associated by at least some customers with a single source." The court then referred to some of plaintiff's repeat customers and to customers that came in solely to buy cards sold with the mark as well as the mark's drawing "the attention of" the Museum of Modern Art.

That plaintiff's product was liked, there can be no doubt; that consumers came to associate plaintiff's product with its mark "PaperCutter" before Fay's adopted use of the mark, however, seems very doubtful indeed. As mentioned above, Fay's opened its first The Paper Cutter store on the same day that plaintiff shipped its first order of goods to a buyer from the trade show. Admittedly, plaintiff used its mark in its display at the trade show and in catalogues before Fay's opened the first store. Nevertheless, given the very slight priority of use of the mark by the plaintiff over the defendant, it is hardly conceivable that customers could have come to associate plaintiff's mark with the source so as to "prevent the use of that term by one whose use had begun before the secondary meaning was acquired." *Saratoga Vichy Spring Co.*, 625 F.2d at 1043. The absence of sales or promotion after plaintiff's initial start-up while a lawsuit was contemplated hardly adds to the strength of the mark involved here, and indeed suggests that plaintiff's mark even now has not acquired secondary meaning.

■ Because plaintiff failed to meet the burden of establishing that its descriptive mark had acquired secondary meaning, we reverse on the cross-appeal, and grant cancellation of plaintiff's registration of the "Papercutter" mark. This holding in and of itself disposes of the main appeal on plaintiff's infringement claim, because a party who does not have exclusive right to use a descriptive term may not bring an action for trademark infringement arising out of a competitor's use of the term. In any case, we note that plaintiff's mark, even if it were valid, has not been infringed by Fay's. Here we believe that the district court's conclusion that there is no likelihood of confusion arising out of Fay's use of the mark is clearly supported by the evidence. PaperCutter's sales were largely restricted to the wholesale market whereas Fay's stores are exclusively retail paper goods stores. Plaintiff's and defendant's businesses deal in different goods; plaintiff produced artistic designs whereas the defendant sells products of other suppliers at the lower end of the picnic/novelty paper goods spectrum. Although each uses or used a little ornamentation in the form of a pair of scissors as a symbol of identification—in the case of plaintiff only on its catalogues and billheads—there is no suggestion that plaintiff's scissors design functions independently as a trademark or creates a separate and distinctive impression on prospective purchasers, rather than simply being an ornamentation for the underlying mark. In any case, the parties' scissors logos are strikingly different, the plaintiff's being shown with a folded or cut paper that again suggests artistic elegance to the eye of the beholder, whereas the defendant's logo shows quasi-children's scissors cutting a dollar sign, signalling to the ordinary purchaser that goods are cheap or at a discount.

Judgment in accordance with opinion.