NYP HOLDINGS, Plaintiff,

v.

**NEW YORK POST PUBLISHING INC., Steven Jude Hoffenberg, et al., Defendants.**

No. 14–cv–8310 (VM).

United States District Court, S.D. New York.

Signed Nov. 17, 2014.

Camille Calman, Samuel Bayard, Davis Wright Tremaine LLP, New York, NY, Laura R. Handman, Davis, Wright, Tremaine, LLP, Washington, DC, for Plaintiff.

Todd Alan Zuckerbrod, Todd A. Zuckerbrod, P.A., Boca Raton, FL, for Defendants.

Steven Jude Hoffenberg, Towers Investors Group New York Post Publishing, Inc., New York, NY, pro se.

## *DECISION AND ORDER*

VICTOR MARRERO, District Judge.

Plaintiff NYP Holdings ("NYP Holdings"), the publisher of the *New York Post*, brings this action for injunctive relief and damages, alleging that defendants New York Post Publishing Inc., Steven Jude Hoffenberg ("Hoffenberg"), and Jane Does 1 through 10 (collectively, "Defendants"), have unlawfully appropriated NYP Holdings's "NEW YORK POST" trademarks ("NEW YORK POST Marks"). NYP Holdings alleges that Defendants' usage of the NEW YORK POST Marks constitutes: (1) trademark infringement in violation of Section 32(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a); (2) trademark infringement, false designation of origin, and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); (4) trademark cyberpiracy under Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d) (also known as the Anticybersquatting Consumer Protection Act, or "ACPA"); (5) common law trademark infringement and unfair competition; and (6) trademark dilution in violation of New York General Business Law § 360–1. (*See* Compl., Dkt. No. 1, at 19–27.) Among other relief, NYP Holdings seeks to enjoin

Defendants from infringing the NEW YORK POST Marks, including but not limited to the use of the "NEW YORK POST PUBLISHING INC." trademark and the "NEWYORKPOSTPUBLISHINGINC" domain name. (*See* Compl. 28–29.)

NYP Holdings filed its Complaint on October 16, 2014, and the Court issued an Order to Show Cause (Dkt. No. 4) on the same day, setting a Show Cause Hearing for October 31, 2014. Defendants were ordered to show cause as to why they should not be preliminarily enjoined, pursuant to Rule 65 of the Federal Rules of Civil Procedure, from, among other activities, using the NEW YORK POST Marks or any trademarks likely to be confusingly similar to, or to dilute, NYP Holdings's trademarks, as well as using the domain name "NEWYORKPOSTPUBLISHINGINC." (*Id.*) NYP Holdings filed a Memorandum of Law in Support of Order to Show Cause for Preliminary Injunction and Expedited Proceedings ("Pl. Mem.") on October 17, 2014, and restricted the scope of its preliminary injunction request to its federal trademark infringement and ACPA violations claims. (*Id.* 9 n. 33.)

Hoffenberg, proceeding *pro se,* then filed two motions (Dkt. Nos. 11,[1] 12 [2]) on October 21, 2014. NYP Holdings, presumably construing Hoffenberg's first motion (Dkt. No. 11) [3] as a response to the Order to Show Cause, filed a Reply Memorandum (Dkt. No. 15) on October 29.

On October 31, 2014, after hearing arguments from the parties, the Court granted NYP Holdings's request for a preliminary injunction, enjoining Defendants from using the NEW YORK POST Marks in violation of the Lanham Act. The Court then issued an order on November 6, 2014 ("November 6 Order"), reciting preliminary findings, explaining with greater specificity the restrictions imposed by the preliminary injunction, and prohibiting Defendants from, among other things: (1) "[u]sing the 'New York Post Publishing Inc.' Mark, or any trademark, service mark, or trade dress that is confusingly similar to any of the NEW YORK POST Marks, on or in connection with any goods or service in commerce in a manner that is likely to cause·confusion in the minds of the public"; and (2) "[o]perating a website with the domain name newyorkpostpublishinginc.com, or any other website with a domain name that uses, incorporates, or is confusingly similar to any of the NEW YORK POST Marks." (Dkt. No. 21.) This Decision and Order provides the findings, reasoning, and conclusions that form the basis for the November 6 Order.

---

**1.** Hoffenberg's first motion was captioned:

Motion Requesting the Courts Extension of Time for the United States Mandated Appearance Under the Hoff Restitution Victims Payments From the Two Defendants That Are Demanded in the Mandatory Victims Restitution Act Whereby the USA Must Litigate for the Victims.

[sic] (Dkt. No. 11, at 1.) The Court denied this motion as irrelevant to the instant action at the Show Cause Hearing on October 31, 2014. (*See* Dkt. No. 20.)

**2.** Hoffenberg's second motion was captioned:

Motion for the Court Order Allow Hoffenberg the Pro Se Defendant to Bring His Two Electronic Devices Iphone by Apple and Mini, Ipad Into This Court Room Needed by the Pro Sec Hoffenberg's Use in the Litigation at Bar.

[sic] (Dkt. No. 12, at 1.) NYP Holdings opposed. (*See* Dkt. No. 13.) The Court granted the motion at the Show Cause Hearing on October 31, 2014, to the extent that Hoffenberg was allowed to use technology in the courtroom only in compliance with this Court's Standing Order M10–468 governing such use. (*See* Dkt. No. 20.)

**3.** *See supra* note 1.

## I. *FACTUAL BACKGROUND*[4]

The *New York Post* is a daily newspaper, sold in many states throughout the United States, both at newsstands and by subscription. It purports to be the oldest, continuously published daily newspaper in the United States. The *New York Post* began publishing news on the web in 1996 and has done so continuously since then, using the website www.nypost.com ("NYPost.com"). NYPost.com is one of the most-read newspaper websites in the United States, with approximately 98 million page views per month, and the website is also accessed by users outside of the United States.

NYP Holdings is the publisher of the *New York Post* and has owned the newspaper since 1993. NYP Holdings is the owner of a number of United States registered trademarks for its goods and services, including "NEW YORK POST" for daily newspapers, online newspapers, and news delivered to mobile devices, as well as non-fiction books, tee-shirts, and mugs (collectively, the "NEW YORK POST Marks"), including:

1) NEW YORK POST, U.S. Trademark Reg. No. 1,526,818, dated February 28, 1989, for "Daily newspaper" (Pl. Mem., Gavenchak Decl. ("Gavenchak Decl."), Ex. A, at 1);

2) NEW YORK POST, U.S. Trademark Reg. No. 2,213,076, dated December 22, 1998, for "Daily newspaper covering a variety of topics" (Gavenchak Decl. Ex. A, at 2);

3) NEW YORK POST, U.S. Trademark Reg. No. 3,639,502, dated June 16, 2009, for "Computer services, namely, providing an online newspaper featuring current local, national and international news and news analysis on a wide variety of topics, photographs, information about a wide variety of topics related to business, sports, gossip, entertainment, celebrities, celebrity life style, travel, fashion and clothing, health, coupons, games, and astrology, accessible via the Internet; publication of a daily electronic newsletter featuring a wide variety of topics related to current local, national and international news, business, sports, gossip, entertainment, travel, fashion, health and local weather, accessible via the Internet" (Gavenchak Decl. Ex. A, at 3);

4) NEW YORK POST, U.S. Trademark Reg. No. 3,652,365, dated July 7, 2009, for "Electronic transmission of newspaper and website content to mobile devices" (Gavenchak Decl. Ex. A, at 4);

5) NEW YORK POST, U.S. Trademark Reg. No. 4,056,288, dated November 15, 2011, for "Downloadable software in the nature of an application for obtaining news, information, commentary, and textual, audio, and visual content of the type found in general interest publications on mobile and stationary consumer elec-

---

4. The following factual summary derives from the parties' submissions to the Court and any declarations and exhibits attached thereto, specifically: Complaint ("the Complaint" or "Compl."), Dkt. No. 1, dated October 16, 2014; Plaintiff's Memorandum of Law in Support of Order to Show Cause for Preliminary Injunction and Expedited Proceedings ("Plaintiff's Memorandum" or "Pl. Mem."), Dkt. No. 6, dated October 17, 2014; defendant Hoffenberg's Motion, ("Hoffenberg's Motion" or "Hoffenberg Mot."), Dkt. No. 11, dated October 21, 2014; and Plaintiff's Reply Memorandum of Law in Further Support of Order to Show Cause for Preliminary Injunction and Expedited Proceedings ("Plaintiff's Reply" or "Pl. Reply"), Dkt. No. 15, dated October 29, 2014.

tronic devices" (Gavenchak Decl. Ex. A, at 5);

6) NEW YORK POST, U.S. Trademark Reg. No. 3,098,182, dated May 30, 2006, for "Printed non-fiction books on a variety of topics" (Gavenchak Decl. Ex. A, at 6);

7) NEW YORK POST, U.S. Trademark Reg. No. 3,199,514, dated January 16, 2007, for "Tee shirts, sweatshirts" (Gavenchak Decl. Ex. A, at 7);

8) NEW YORK POST, U.S. Trademark Reg. No. 3,199,515, dated January 16, 2 007, for "Tee shirts, fashion tops, sweatshirts, and underwear" (Gavenchak Decl. Ex. A, at 8);

9) NEW YORK POST, U.S. Trademark Reg. No. 3,357,150, dated December 18, 2007, for "Mugs made from glass or ceramic" (Gavenchak Decl. Ex. A, at 9); and

10) NEW YORK POST, U.S. Trademark Reg. No. 3,319,743, dated October 23, 2007, for "Mugs made from glass or ceramic" (Gavenchak Decl. Ex. A, at 10).

NYP Holdings asserts that it and its predecessors "have continuously used the NEW YORK POST Marks or predecessor marks in connection with the *New York Post's* publishing activities since at least 1934." (Compl. 3.)

Additionally, seven of the NEW YORK POST Marks have become "incontestable" under 15 U.S.C. § 1065. These are U.S. Trademark Reg. Nos. 1,526,818, 2,213,076, 3,098,182, 3,199,514, 3,199,515, 3,319,743, 3,357,150, and Section 15 Declarations for these marks filed with the United States Patent and Trademark Office are annexed as Exhibit B to the Gavenchak Declaration.

Defendant Hoffenberg was the *New York Post's* publisher from January to March 1993. During that time he sought to purchase the *New York Post,* but was unable to complete the transaction. In 1993, during his brief stint as the publisher of the *New York Post,* Hoffenberg created a Delaware corporation called "New York Post Publishing Inc." ("the Hoffenberg Corporation"). The Delaware Secretary of State voided the Hoffenberg Corporation's Certificate of Incorporation under Delaware Corporation Law § 502 in March 1995 because of the Hoffenberg Corporation's failure to file its annual franchise tax report and pay the franchise tax.

In 1997, Hoffenberg was sentenced to 20 years in federal prison for defrauding investors in his company, Tower Investors. Between 1995 and June 2014, the Hoffenberg Corporation did not exist and appears to have been completely inactive. However, on June 12, 2014—after his release from prison—Hoffenberg filed a Certificate of Renewal with the Delaware Secretary of State to bring the Hoffenberg Corporation back into good standing. It appears that the Hoffenberg Corporation never offered any goods or services in commerce until September 2014.

On June 16, 2014, NYP Holdings's in-house counsel received a phone call from someone claiming to be a lawyer representing Hoffenberg. The lawyer communicated to NYP Holdings that Hoffenberg was intending to use the name "New York Publishing Inc.," and advised NYP Holdings that he was authorized to accept service on Hoffenberg's behalf, should NYP Holdings wish to sue Hoffenberg. On June 24, 2014, NYP Holdings's in-house counsel wrote a letter to the lawyer, copying Hoffenberg, informing them that Hoffenberg had no rights to the *New York Post's* name or trademark and stating that any usage of the name or trademarks

would infringe NYP Holdings's intellectual property rights. On the same day, NYP Holdings received a response from the attorney stating that he did not represent Hoffenberg. NYP Holdings then sent another copy of the letter to Hoffenberg and spoke to Hoffenberg on the phone on the afternoon of June 24, 2014. NYP Holdings's counsel reiterated its "demand that Hoffenberg cease and desist from any use of the New York Publishing Inc. name." (Compl. 13.) NYP Holdings's counsel then communicated with Hoffenberg by email and phone. Hoffenberg continued to assert his intention to use the name "New York Post Publishing Inc."

On August 25, 2014, Defendants issued a press release titled "Business Man Steven J. Hoffenberg to Once Again Publish the New York Post Publishing Inc." (Pl. Mem. 7.) The press release also stated that "[a]lthough [Hoffenberg] has spent a number of years away from the newspaper, his return is a welcomed one by many vital persons involved with NewsCorp." (*Id.*)

On September 16, 2014, NYP Holdings discovered a website at the address www.newyorkpostpublishinginc.com ("the Hoffenberg Website"). The Hoffenberg Website features the words "New York Post Publishing Inc" at the top of the home page, with the words "New York Post" in large white block letters over a black background, and the words "Publishing Inc." in smaller, dark purple script letters. The Hoffenberg Website offers news content, with links to various articles within the Website, contains advertisements, and includes a representation of a 1993 *New York Post* cover with the headline "Hoffenberg Saves the Post." The Hoffenberg Website has a link to a "History of the New York Post," and contains a statement that "All of the assets inclusive of the trademarks and the website, New York Post, which receives 78 million hits per day, are rightfully owned by Steven Hoffenberg and TowersInvestors.com, not Rupert Murdoch." (Pl. Mem. 6.)

NYP Holdings's outside counsel sent a letter to the Hoffenberg Website's hosting service and domain registrar the next day, demanding that it withdraw its services from Defendants. The Hoffenberg Website was temporarily disabled, but was reactivated on September 18, 2014. Since then, Hoffenberg repeatedly communicated with in-house and outside counsel for NYP Holdings, and continued to assert his right to and intention to use the name "New York Post Publishing Inc." and to invite NYP Holdings to file suit against him. (*See* Gavenchak Decl. ¶ 43; Handman Decl. Ex. B.)

On October 6, 2014, an article appeared on the Hoffenberg Website stating that "[b]usinessman mogul Steven J. Hoffenberg, CEO/Publisher New York Post Publishing Inc. has announced that the newspaper, which is currently online will expand to newsstands free of charge." (Pl. Mem. 5; Gavenchak Decl. Ex. Q.) The article describes Hoffenberg's plan to "partner[ ] with other free newspapers, licensing them the New York Post Publishing Inc. title." (*Id.*) NYP Holdings then filed this suit on October 16, 2014.

NYP Holdings asserts that Defendants also maintain a separate website called "Post All Star News," which publishes content similar to the Hoffenberg Website, displays the same photo of a 1993 *New York Post* cover reading "Hoffenberg Saves the Post," and contains a legend at the bottom reading "Steven J. Hoffenberg, CEO New York Post Publishing Inc., licensed to POSTALLSTARRNEWS.COM." (*Id.*)

## II. DISCUSSION

### A. Legal Standard

A party seeking a preliminary injunction must demonstrate: (1) "either

(a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation"; (2) "that he is likely to suffer irreparable injury in the absence of an injunction"; (3) "remedies at law, such as monetary damages, are inadequate to compensate for that injury"; (4) the "balance of hardships between the plaintiff and defendant ... tips in the plaintiff's favor"; and (5) "the public interest would not be disserved by the issuance of a preliminary injunction." [5] *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.,* 704 F.Supp.2d 305, 328 (S.D.N.Y.2010) (*quoting Salinger v. Colting,* 607 F.3d 68, 74–75 (2d Cir.2010) (internal quotation marks omitted); *see also Mrs. U.S. Nat. Pageant, Inc. v. Miss U.S. Org., LLC,* 875 F.Supp.2d 211, 226 (W.D.N.Y.2012). "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118 (2d Cir.2009).

### B. *Application*

#### 1. *Likelihood of Success on the Merits*
##### a. *Trademark Infringement*

■ To prevail on a trademark infringement claim under Sections 32(a) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a) respectively, "a plaintiff must establish that it possesses a valid, legally protectible mark and that defendant's subsequent use of a similar mark is likely to create confusion as to the origin of the product at issue." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,* 192 F.3d 337, 344 (2d Cir.1999); *see also Time, Inc. v. Petersen Pub. Co. L.L.C.,* 173 F.3d 113, 117 (2d Cir.1999).

##### i. *Protectible Marks*

■ In the case at hand, NYP Holdings has produced valid federal registrations for the marks it seeks to protect, and many of the marks are incontestable. (*See* Pl. Mem. 9; Gavenchak Decl. ¶¶ 6–9, Exs. A, B.) A certificate of registration for a trademark "is prima facie evidence that the mark is registered and valid (*i.e.,* protectible), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Lane Capital Mgmt., Inc.,* 192 F.3d at 345 (*citing* the Lanham Act, 15 U.S.C. § 1115(a)); *see also Cartier, a Div. of Richemont N. Am., Inc. v. Aaron Faber, Inc.,* 396 F.Supp.2d 356, 359 (S.D.N.Y. 2005) (*quoting Gruner + Jahr USA Pub.,* 991 F.2d 1072, 1076 (2d Cir.1993) ("[A] mark registered by its owner shall be *prima facie* evidence of the registrant's exclusive right to use the mark in commerce on the product.... A registered mark becomes incontestable if it has been in continuous use for five consecutive years sub-

---

5. Previously, irreparable harm was presumed in trademark infringement actions in the Second Circuit where a sufficient showing of the likelihood of confusion had been made. *See, e.g., Federal Express Corp. v. Federal Espresso, Inc.,* 201 F.3d 168, 174 (2d Cir.2000); *E. Gluck Corp. v. Rothenhaus,* 585 F.Supp.2d 505, 519 (S.D.N.Y.2008). However, under *Salinger v. Colting,* 607 F.3d 68 (2d Cir.2010), irreparable harm is no longer presumed. The *Salinger* Court, in holding that the standard for issuing injunctions set forth in the Supreme Court case *eBay v. MercExchange, LLC,* 547 U.S. 388, 390, 126 S.Ct. 1837, 164

L.Ed.2d 641 (2006) also applied to the issuing of preliminary injunctions in copyright matters, stated that it "s[aw] no reason that [the standard set forth in] *eBay* would not apply with equal force to an injunction in *any* type of case." *Salinger,* 607 F.3d at 78 n. 7 (emphasis in original). Thus, while the Second Circuit has not specifically addressed whether the *eBay* standard applies to preliminary injunctions in trademark infringement matters, the Court will apply the injunction standard set forth in *eBay* and *Salinger* to the case at bar.

sequent to its registration and is still in use." (*citing* the Lanham Act, 15 U.S.C. §§ 1065 & 1115(a)))).

■ Because NYP Holdings has made a *prima facie* showing that the NEW YORK POST Marks are protectible, the burden falls to Defendants to demonstrate that those marks are not entitled to protection. *See Lane Capital Mgmt., Inc.,* 192 F.3d at 345. Defendants have not met this burden. In fact, Hoffenberg continues to assert that the marks are indeed "trademarks," but claims that he "controls the trademarks." (Hoffenberg Mot. ¶ 16.)

Yet, Hoffenberg has provided no evidence beyond his bare and conclusory assertions that he owns or controls the marks at issue. To the contrary, trademark ownership is generally based upon priority of use (*see, e.g., ITC Ltd. v. Punchgini, Inc.,* 482 F.3d 135, 147 (2d Cir. 2007)) and continuous use in commerce (*see* 15 U.S.C. § 1058), neither of which Hoffenberg has even alleged. (*See generally,* Hoffenberg Mot.) The facts presented in this case show instead that Hoffenberg incorporated a business name containing the NEW YORK POST Marks—an action that in and of itself does not create trademark rights (*see, e.g., United We Stand America, Inc. v. United We Stand, America New York,* 128 F.3d 86, 93 (2d Cir. 1997))—but then allowed the Hoffenberg Corporation's existence to lapse for more than 14 years. He later renewed the Hoffenberg Corporation's certification of good standing pursuant to Delaware law in June 2014, and only after the Hoffenberg Corporation's renewal did he begin using the marks. (*See* Pl. Mem. 6.) In contrast, NYP Holdings maintains that it and its predecessors have been using the NEW YORK POST Marks in commerce continuously since at least 1934. (Pl. Mem. 1.)

NYP Holdings has therefore established that it possesses valid, legally protectible marks.

### ii. *Likelihood of Confusion*

■ In determining the likelihood of confusion, the Court looks to the nonexclusive factors established in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.1961):

(1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will "bridge the gap" . . .; (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the buyers.

*Arrow Fastener Co., Inc. v. Stanley Works,* 59 F.3d 384, 391 (2d Cir.1995). An analysis of these factors at this stage weighs heavily in favor of NYP Holdings. With regard to the first factor—the strength of the marks—NYP Holdings has produced federal registrations for the NEW YORK POST Marks, many of which are incontestable. (*See* Pl. Mem. 9; Gavenchak Decl. ¶¶ 6–9, Exs. A, B.) The *New York Post* is also read by millions of people nationally and internationally, and the marks are well-known and associated with its brand. With regard to the degree of similarity between the marks, Defendants' marks are extremely similar to the NEW YORK POST Marks. Defendants' Hoffenberg Corporation, news service name, and domain name all contain the words "NEW YORK POST" within them. Moreover, the addition of the words "Publishing Inc." to the Defendants' marks only increases the likelihood of confusion, rather than reduces it, given that consumers associate the *New York Post* name with publishing. *See De Beers LV Trademark Ltd. v. De-Beers Diamond Syndicate, Inc.,* 440 F.Supp.2d 249, 276 (S.D.N.Y.2006); *see*

*also* Pl. Mem. 15. Furthermore, the format, trade dress, and overall look and feel of Defendants' Hoffenberg Website are also very similar to NYPost.com. (*See* Pl. Mem. 3–5.)

Regarding the proximity of the products, those created by Defendants appear at this stage to be nearly identical with the NEW YORK POST Marks. Defendants are publishing a web-based news service and stating that they will publish a newspaper; these are exactly the same goods and services produced by NYP Holdings. Furthermore, the goods and services produced by Defendants fall within the same categories, appeal to the same class of consumers, and are sold through the same channels as the goods and services produced by NYP Holdings using the NEW YORK POST Marks. *See Clinique Labs., Inc. v. Dep Corp.,* 945 F.Supp. 547, 553 (S.D.N.Y.1996).

The fourth factor, the likelihood that NYP Holdings will "bridge the gap," is inapplicable because the parties' goods and services are already in direct competition with each other. *See, e.g., Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,* 588 F.3d 97, 115 (2d Cir.2009). NYP Holdings has presented no empirical evidence of actual confusion at this stage, so the fifth factor weighs neutrally between the parties.

The sixth factor—whether Defendants adopted the marks in good faith—weighs in favor of NYP Holdings. The evidence presented at this early stage of the inquiry suggests that Defendants intentionally adopted marks known to be used by and registered to NYP Holdings, presumably to profit from the NEW YORK POST Marks' notoriety. (*See* Gavenchak Decl. ¶¶ 11–13, 14 (discussing the notoriety of the NEW YORK POST Marks and Hoffenberg's brief time as publisher of the *New York Post*).) At a minimum, Defendants set up and began using the Hoffen-berg Website after being put on notice by NYP.Holdings that NYP Holdings considered such actions to be an infringement of the NEW YORK POST Marks. (*See* Gavenchak Decl. ¶ 20, Ex. G.) The Hoffenberg Website and Defendants' press releases also contain what appear to be deliberately misleading statements about the connection between the Hoffenberg Website and the *New York Post* (*see* Gavenchak Decl. ¶¶ 25–28, 35, 36, Exs. K, L, P, Q, T), and the Hoffenberg Website's design in certain respects suggests it may have been engineered with the intent to deceive readers into believing they are reading NYPost.com (*see* Pl. Mem. 17).

The seventh factor—the quality of Defendants' product—also weighs in favor of NYP Holdings. The numerous screen shots of the Hoffenberg Website presented by NYP Holdings as exhibits to its Memorandum reveal run-on sentences, grammatical errors, and reprints of articles from other sources. (*See, e.g.,* Gavenchak Decl. Exs. N, R, S, T.) The facts at this stage of the inquiry suggest that the association of the NEW YORK POST Mark with the Hoffenberg Website is likely to present a threat to the *New York Post'*s reputation.

With regard to the sophistication of the buyers, which "refers . . . to the ability of the purchasers to distinguish between the two trade dresses, given the attention that such purchasers ordinarily give in buying products or services" (*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,* 813 F.Supp.2d 489, 546 (S.D.N.Y. 2011)), inexpensive, disposable products are generally considered to have unsophisticated consumers. *See, e.g., Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 317 F.3d 209, 219 (2d Cir.2003); *Car–Freshner Corp. v. Big Lots Stores, Inc.,* 314 F.Supp.2d 145, 152 (N.D.N.Y.2004). Certainly, free news media, such as those produced by NYP Holdings and Defendants,

338

that are available for consumption on the internet or at newsstands and covering topics including "fashion," "entertainment," and "sports," are both inexpensive and disposable. Additionally, "when, as here, there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion." *Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C.*, 182 F.3d 133, 143 (2d Cir. 1999) (internal quotation marks omitted). This factor thus also weighs in favor of NYP Holdings.

The analysis as a whole—with the first, second, third, sixth, seventh, and eighth factors weighing in NYP Holdings's favor (some very heavily so), the fourth factor being inapplicable, and the fifth factor being neutral at this stage of the inquiry—demonstrates that there is a significant likelihood of confusion between the NEW YORK POST Marks and the marks used by Defendants. Accordingly, the Court finds that NYP Holdings has demonstrated a likelihood of success on the merits with regard to its trademark infringement claims.

### b. *Anticybersquatting Consumer Protection Act ("ACPA")*

The Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), enacted as part of the Lanham Act in 1999, "creates a right of action against a person or entity that registers an internet domain name in bad faith, using someone else's protected mark." *Mrs. U.S. Nat. Pageant, Inc.*, 875 F.Supp.2d at 232. A successful claim under the ACPA, must demonstrate that: (1) the plaintiff's marks were distinctive or famous at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3) the infringer has a bad faith intent to profit from that mark.

*See* 15 U.S.C. § 1125(d)(1)(A); *Webadviso v. Bank of America Corp.*, 448 Fed.Appx. 95, 97 (2d Cir.2011). "[A] court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C).

#### i. *Distinctive or Famous at Time of Domain Name Registration*

In the instant action, NYP Holdings has produced valid federal registrations, with dates ranging from February 28, 1989 to November 15, 2011, for the marks it seeks to protect, and has shown that many of the marks are incontestable. (*See* Pl. Mem. 9; Gavenchak Decl. ¶¶ 6–9, Exs. A, B.) Proof of registration "creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive." *Lane Capital Mgmt., Inc.*, 192 F.3d at 345 (citing *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 563 (2d Cir.1990); *see also Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 381 (2d Cir.2005) ("To qualify for registration a mark must be sufficiently 'distinctive' to distinguish the registrant's goods from those of others."). "[T]he defendant [then] bears the burden to rebut the presumption ... by a preponderance of the evidence." *Lane Capital Mgmt., Inc.*, 192 F.3d at 345.

Defendants have not met this burden. Defendants' domain name was registered on September 13, 2014, well after the NEW YORK POST Marks were registered. (*See* Pl. Mem. 3 n. 9; Gavenchak Decl. Ex. A.) Indeed, Hoffenberg has not disputed that the NEW YORK POST Marks were distinctive at the time Defendants registered their domain name. (*See generally* Hoffenberg Mot.) Instead, Hoffenberg has continued to assert, while providing no supporting evidence, that he

"controls the trademarks." (Hoffenberg Mot. ¶ 16.)

While it is not necessary for success under ACPA that a plaintiff demonstrate that its marks are distinctive *and* famous, there is also significant evidence that the NEW YORK POST Marks are famous within the meaning of the Lanham Act. While the ACPA, 15 U.S.C. § 1125(d), does not specifically define "famous," that term is defined elsewhere within the Lanham Act in § 1125(c)(2)(A), in the context of trademark dilution claims. *See* 15 U.S.C. § 1125(c)(2)(A); *Cello Holdings, L.L.C. v. Lawrence–Dahl Companies,* 89 F.Supp.2d 464, 472–73 (S.D.N.Y.2000). The *New York Post's* long publishing history, high volume of readers, wide geographic reach, extensive advertising and promotion, and the registration of the NEW YORK POST Marks, all weigh heavily in NYP Holdings' favor. (*See* 1125(c)(2)(A); Gavenchak Decl. ¶¶ 11–12; Pl. Mem. 19–20; Compl. 4.)

NYP Holdings has therefore established that the NEW YORK POST Marks were both distinctive and famous at the time Defendants registered the domain name "newyorkpostpublishinginc.com."

#### ii. *Identical or Confusingly Similar*

The Second Circuit has noted that the "confusingly similar" standard in the ACPA is a different standard from the "likelihood of confusion" standard for trademark infringement. *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.,* 202 F.3d 489, 497 n. 11 (2d Cir.2000) (*citing Wella Corp. v. Wella Graphics, Inc.,* 37 F.3d 46, 48 (2d Cir.1994)). Rather than analyze the likelihood of confusion under the *Polaroid* factors, the Court must take a more common-sense approach and "simply ... determine[ ] whether ["newyorkpostpublishinginc.com"] is confusingly similar to [the NEW YORK POST Marks]." *Wella*

*Corp.,* 37 F.3d at 48; *see also Sporty's Farm L.L.C.,* 202 F.3d at 497–98.

While the domain name "newyorkpostpublishinginc.com" adds "publishinginc.com" to the phrase "newyorkpost" and is in all lower case letters as opposed to capital letters, web addresses are not caps-sensitive and contain no spaces, and the ".com" only signifies the site's commercial nature. *Cf. Sporty's Farm L.L.C.,* 202 F.3d at 498 (holding that "sportys.com" was confusingly similar to the mark "Sporty's") (*citing Brookfield Communications, Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036, 1055 (9th Cir.1999)). The Hoffenberg Website's domain name fully incorporates the words "NEW YORK POST," and the addition of "publishinginc.com," does not diminish the similarity between the domain name and the NEW YORK POST Marks. The Court therefore finds that the domain name of the Hoffenberg Website is confusingly similar to the NEW YORK POST Marks.

#### iii. *Bad Faith Intent to Profit From Mark*

The Second Circuit has "expressly note[d] that 'bad faith intent to profit' are terms of art in the ACPA and hence should not necessarily be equated with 'bad faith' in other contexts." *Sporty's Farm,* 202 F.3d at 499 n. 13. The ACPA provides a non-inclusive list of factors courts may consider in determining whether a person has bad faith intent:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).

However, Courts are not limited to considering just the listed factors, and may consider "the unique circumstances of the case," whether or not they "fit neatly into the specific factors enumerated by Congress." *Sporty's Farm,* 202 F.3d at 499 (*quoted by Gioconda Law Grp. PLLC v. Kenzie,* 941 F.Supp.2d 424, 433 (S.D.N.Y. 2013)). "As part of that analysis, courts look to a defendant's whole course of conduct." *Gioconda Law Grp. PLLC,* 941 F.Supp.2d at 433.

There is significant evidence at this stage of the proceedings that Defendants are using the domain name "newyorkpost-publishinginc.com" in bad faith and with intent to profit from the NEW YORK POST Marks and the reputation of the *New York Post* with their usage. Many of the factors enumerated in 15 U.S.C. § 1125(d)(1)(B)(i) weigh in favor of NYP Holdings. Indeed, the fifth factor, consideration of

the [defendant's] intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site,

weighs heavily in favor of NYP Holdings. 15 U.S.C. § 1125(d)(1)(B)(i)(V). There is significant evidence, even at this early stage of the proceedings, that Defendants acquired and began operating the Hoffenberg Website with the express purpose of diverting consumers from NYPost.com to newyorkpostpublishinginc.com, and that Defendants deliberately attempted to mislead consumers as to the connection between the Hoffenberg Website and the *New York Post. See supra section* III(B)(1)(a)(ii); Gavenchak Decl. ¶¶ 11–13,

14, 20, 25–28, 35, 36, Exs. G, K, L, P, Q, T; Pl. Mem. 17.

Furthermore, Defendants have demonstrated no prior use of the domain name in connection with the bona fide offering of goods or services and have demonstrated no bona fide noncommercial or fair use of the NEW YORK POST Marks in a site accessible under the domain name. *See* 15 U.S.C. § 1125(d)(1)(B)(i). Considering these factors, along with the Defendants' "whole course of conduct" (*Gioconda Law Grp. PLLC,* 941 F.Supp.2d at 433), the Court finds that Defendants have exhibited bad faith intent to profit within the meaning of the ACPA.

Accordingly, the Court finds that NYP Holdings has demonstrated likelihood of success on the merits with regard to its ACPA claims.

### 2. *Irreparable Injury*

■■■■ "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB,* 559 F.3d at 118. The Second Circuit has instructed that claims of irreparable harm sufficient to support injunctive relief must be real, actual, and imminent, not remote or speculative. *See, e.g., Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir. 2002); *Levin v. Harleston,* 966 F.2d 85, 90 (2d Cir.1992). Additionally,

> [a]lthough irreparable harm may not be presumed upon a showing of a likelihood of success, *see eBay,* 547 U.S. at 393, 126 S.Ct. 1837; *Salinger,* 607 F.3d at 80, "[i]rreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark ... because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.,* 800 F.Supp.2d

515, 540 (S.D.N.Y.2011). Thus, it will often be the case that a party's demonstration of a likelihood of success on a trademark claim will also show a threat of irreparable harm.

*Mrs. U.S. Nat. Pageant, Inc.,* 875 F.Supp.2d at 226–27 (W.D.N.Y.2012). "Although a likelihood of confusion does not create a presumption of irreparable injury, a particularly strong likelihood of confusion should weigh in favor of finding irreparable injury." *Marks Org., Inc. v. Joles,* 784 F.Supp.2d 322, 334 (S.D.N.Y.2011).

■■■■ In the instant case, NYP Holdings has demonstrated that irreparable injury is likely to occur in the absence of injunction, with regard to both its trademark infringement claims and its ACPA claims. NYP Holdings has demonstrated that significant confusion is likely to occur between its products and services and those offered by Defendants, due to the confusing similarity of the Defendants' domain name to the NEW YORK POST Marks, the similarity of the trade dress and the products and services offered, and the use of the NEW YORK POST Marks throughout the Hoffenberg Website and other materials published or otherwise put forth by Defendants. Such confusion is likely to undermine the goodwill and reputation of the *New York Post* among the newspaper's readers, and cause NYP Holdings to lose control over its own reputation and the quality of its products and services.

Additionally, the Hoffenberg Website and other sources clearly state New York Post Publishing Inc.'s affiliation with Hoffenberg and misrepresent Hoffenberg's relationship with the *New York Post* in multiple places (*see, e.g.,* Gavenchak Decl. Exs. N, Q, T); this linking of the *New York Post*'s reputation with Hoffenberg, who has a serious criminal history, is also likely to damage NYP Holdings's goodwill and reputation. Furthermore, NYP Holdings's

loss of both goodwill and ability to control its reputation presumably will only be amplified if Defendants go forward with their plan to publish a free newspaper. (*See* Gavenchak Ex. Q). The harm done to NYP Holdings by Defendants' actions, if not enjoined, would be "difficult to replace and difficult to measure." *Salinger*, 607 F.3d at 81. Accordingly, NYP Holdings has established that it would suffer irreparable injury in the absence of an injunction.

### 3. *Lack of Adequate Remedies at Law*

"Because the losses of reputation and goodwill and resulting loss of customers are not precisely quantifiable, remedies at law [such as monetary damages] cannot adequately compensate [NYP Holdings] for its injuries." *U.S. Polo Ass'n, Inc.*, 800 F.Supp.2d at 541 (*citing Northwestern Nat'l Ins. Co. of Milwaukee, Wisc. v. Alberts*, 937 F.2d 77, 80 (2d Cir.1991)); *see also Salinger*, 607 F.3d at 80 (*quoting eBay*, 547 U.S. at 391, 126 S.Ct. 1837). NYP Holdings will suffer irreparable harm if Defendants are not enjoined from their operation of the Hoffenberg Website and use of the NEW YORK POST Marks, and no adequate remedy at law exists to cure that harm. NYP Holdings has therefore established that no adequate remedy at law exists in the case at hand.

### 4. *Balance of Hardships*

NYP Holdings faces immediate and irreparable harm to its legitimate business interests and federally registered trademarks. NYP Holdings asserts that it "has spent hundreds of millions of dollars producing the *New York Post*, including significant amounts on advertising and promotion of the newspaper, website, and the related NEW YORK POST Marks throughout the United States in a variety of media." (Pl. Mem. 3; Gavenchak Decl.

¶ 12.) NYP Holdings has much at stake and the potential for great, irreparable loss. In contrast, while Defendants would certainly be forced to change the name "New York Post Publishing Inc." and abandon the Hoffenberg Website and other materials in the event of an injunction, Defendants have shown no legitimate, legal interest in using or right to use the NEW YORK POST Marks. Accordingly, the balance of the hardships tips in NYP Holdings's favor.

### 5. *Public Interest*

"The consuming public has a protectable interest in being free from confusion, deception and mistake. *U.S. Polo Ass'n, Inc.*, 800 F.Supp.2d at 541 (*citing New York City Triathlon*, 704 F.Supp.2d at 344 ("[T]he public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality.") (*citing SK & F. Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1067 (3d Cir. 1980)))." Accordingly, the public interest in this case weighs in favor of granting the injunction, and there is no disservice to the public done by the issuance of the injunction.

### III. *CONCLUSION*

NYP Holdings is entitled to a preliminary injunction with regard to both its trademark infringement claims and its ACPA claims, having demonstrated likelihood of success on the merits on its claims, that it is likely to suffer irreparable injury in the absence of an injunction, that remedies at law are inadequate, that the balance of the hardships tips in its favor, and that the public interest would not be disserved by the issuance of a preliminary injunction. *See Salinger v. Colting*, 607 F.3d at 74–75. The Court therefore affirms its November 6 Order (Dkt. No. 21)

enjoining Defendants from operating the Hoffenberg Website and using any of the NEW YORK POST Marks in commerce in violation of the Lanham Act, as set forth in greater detail in that Order. Additionally, expedited proceedings, as requested by NYP Holdings, are necessary to ensure prompt and appropriate resolution of the case at hand.

## IV.  *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the Court's Order dated November 6, 2014 (Dkt. No. 21) is amended to incorporate the discussion and decision set forth above and in other respects reaffirmed; and it is further

**ORDERED** that NYP Holdings' request for expedited proceedings in this matter is **GRANTED;** and it is further

**ORDERED** that the parties confer and submit for the Court's approval a proposed case management plan to govern the schedule of pretrial proceedings in this case. The proposed case management plan is to be submitted within ten days of the issuance of this Order.

**SO ORDERED.**